UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, et al.,<br><br>   Debtor in Foreign<br>   Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (CGM)<br><br>Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN<br>LIQUIDATION), et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>HSBC SECURITIES SERVICES<br>(LUXEMBOURG) SA, et al.,<br><br>   Defendants. | Adv. Pro. No. 10-03630 (CGM) |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Date: December 15, 2022

SELENDY GAY ELSBERG PLLC

David Elsberg
Maria Ginzburg
Jordan Goldstein
Lena Konanova
David S. Flugman
Joshua S. Margolin
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000

-and-

BROWN RUDNICK LLP

David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800

## TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................4

    A.    The Funds.......................................................................................................4

    B.    HSSL's Investment In The Funds..................................................................4

STANDARD.............................................................................................................12

ARGUMENT ...........................................................................................................13

I.     HSSL Has Sufficient Minimum Contacts With The United States ...................13

    A.    HSSL Knowingly And Intentionally Invested In Madoff Feeder Funds..............15

        1.    HSSL Purposefully Availed Itself Of The United States Via Its
            Intentional Investment In The Funds .........................................................15

        2.    HSSL's Intentional Investment In The Funds Directly Relates To
            The Liquidators' Claims ...........................................................................22

    B.    HSSL Utilized U.S. Correspondent Accounts To Invest In And Receive
        Redemption Payments From Sentry ...........................................................23

        1.    HSSL Deliberately Utilized U.S. Correspondent Accounts In Lieu
            Of Offshore Accounts ...............................................................................24

        2.    HSSL Utilized U.S. Correspondent Accounts To Effectuate More
            Than ▮ Wire Transfers .............................................................................28

        3.    HSSL's Correspondent Account Use Was Sufficiently Related To
            The Harms Alleged ...................................................................................30

    C.    HSSL Engaged In Other Business Activity In And Directed At The United
        States.............................................................................................................31

    D.    The Court May Exercise Jurisdiction Over HSSL Even If The Transfers
        Are Deemed Foreign For Purposes Of The Bankruptcy Safe Harbor
        Analysis.........................................................................................................34

II.    The Exercise Of Jurisdiction Over HSSL Is Reasonable................................36

CONCLUSION.........................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)................................................................34

*In re Ampal-Am. Israel Corp.*,
562 B.R. 601 (Bankr. S.D.N.Y. 2017)...................................................34

*In re Arcapita Bank B.S.C.(C)*,
2022 WL 1620307 (S.D.N.Y. May 23, 2022) ........................................27

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
480 U.S. 102 (1987)........................................................................36

*Averbach v. Cairo Amman Bank*,
2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ..........................................29

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
902 F.2d 194 (2d Cir. 1990)..............................................................12

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
137 S. Ct. 1773 (2017).........................................................13, 36, 40

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).....................................................13, 21, 31, 36

*Cunningham v. Gen. Motors LLC*,
2021 WL 827124 (S.D.N.Y. Mar. 4, 2021) ......................................36, 40

*Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*,
722 F.3d 81 (2d Cir. 2013)................................................................12

*Drake v. Lab. Corp. of Am. Holdings*,
2008 WL 4239844 (E.D.N.Y. Sept. 11, 2008) ........................................12

*In re Eur. Gov't Bonds Antitrust Litig.*,
2020 WL 4273811 (S.D.N.Y. July 23, 2020) ..........................................31

*In re Fairfield Sentry Ltd.*,
2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ..............................23, 32

*In re Fairfield Sentry Ltd.*,
596 B.R. 275 (Bankr. S.D.N.Y. 2018) ..............................................27, 34

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) .......................................................................................14, 34, 40

*Goodyear Dunlap Tires Ops., S.A. v. Brown*,
   564 U.S. 915 (2011) ......................................................................................................14

*Gucci Am., Inc. v. Weixing Li*,
   135 F. Supp. 3d 87 (S.D.N.Y. 2015) .............................................................................38

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947) ......................................................................................................39

*Hau Yin To v. HSBC Holdings PLC*,
   2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) ..................................................................27

*Hill v. HSBC Bank PLC*,
   207 F. Supp. 3d 333 (S.D.N.Y. 2016) ...........................................................................27

*Iragorri v. United Techs. Corp.*,
   274 F.3d 65 (2d Cir. 2001) ............................................................................................39

*J. McIntyre Mach., Ltd. v. Nicastro*,
   564 U.S. 873 (2011) ......................................................................................................21

*In re Lehman Bros. Holdings Inc.*,
   535 B.R. 608 (Bankr. S.D.N.Y. 2015) ..........................................................................13

*Licci v. Lebanese Canadian Bank, SAL*,
   984 N.E.2d 893 (N.Y. 2012) .............................................................................14, 24, 29

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 (2d Cir. 2012) ..............................................................................................3

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) .................................................................................. *passim*

*Linzer v. EMI Blackwood Music, Inc.*,
   904 F. Supp. 207 (S.D.N.Y. 1995) .................................................................................5

*Loginovskaya v. Batrachenko*,
   764 F.3d 266 (2d Cir. 2014) ..........................................................................................35

*In re Madoff Secs.*,
   513 B.R. 222 (S.D.N.Y. 2014) ......................................................................................35

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
   12 N.E.3d 456 (N.Y. 2014) ...........................................................................................30

*McGee v. Int'l Life Ins. Co.*,
  355 U.S. 220 (1957)......................................................................................14

*McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani*,
  295 F. Supp. 3d 404 (S.D.N.Y. 2017).........................................................12

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996)............................................................12, 13, 36

*In re Motors Liquidation Co.*,
  565 B.R. 275 (Bankr. S.D.N.Y. 2017).........................................................32

*MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*,
  2021 WL 4461773 (S.D.N.Y. Sept. 29, 2021).............................................14

*Nike, Inc. v. Wu*,
  349 F. Supp. 3d 310 (S.D.N.Y. 2018).........................................................38

*Obabueki v. Int'l Bus. Machines Corp.*,
  2001 WL 921172 (S.D.N.Y. Aug. 14, 2001)...........................................12, 13

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
  549 B.R. 56 (S.D.N.Y. 2016)........................................................25, 26, 27, 29

*Picard v. Banque Lombard Odier & Cie SA (In re Bernard L. Madoff)*,
  2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022).................................. *passim*

*Picard v. Barfield Nominees Ltd. (In re Bernard L. Madoff)*,
  2022 WL 4542915 (Bankr. S.D.N.Y. Sept. 28, 2022)..................................3, 16, 17

*Picard v. BNP Paribas S.A. (In re Bernard L. Madoff)*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018)...........................................................23, 31

*Picard v. Bureau of Labor Ins. (SIPC v. Bernard L. Madoff Inv. Secs. LLC)*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012)........................................................... *passim*

*Picard v. Bureau of Labor Insurance*,
  2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) ..........................................35

*Picard v. Cathay Life Ins. Co. (In re Bernard L. Madoff)*,
  2022 WL 16626325 (Bankr. S.D.N.Y. Nov. 1, 2022) .................................... *passim*

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
  627 B.R. 546 (Bankr. S.D.N.Y. 2021).................................................. 13, 14, 30-31

*Picard v. JP Morgan Chase & Co. (In re Bernard L. Madoff Inv. Secs. LLC)*,
  2014 WL 5106909 (Bankr. S.D.N.Y. Oct. 10, 2014) .............................................16

*Picard v. Maxam Absolute Return Fund, L.P.*,
   460 B.R. 106 (Bankr. S.D.N.Y. 2011) ...........................................................14, 16

*Picard v. Meritz Fire & Marine Ins. Co. Ltd.* (*In re Bernard L. Madoff*),
   2022 WL 3273044 (Bankr. S.D.N.Y. Aug. 10, 2022) ...........................................24

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Secs. LLC*,
   917 F.3d 85 (2d Cir. 2019).................................................................................16, 35

*In re Platinum & Palladium Antitrust Litig.*,
   449 F. Supp. 3d 290 (S.D.N.Y. 2020)......................................................................31

*Purdue Res. Found. v. Sanofi-Synthelabo, S.A.*,
   338 F.3d 773 (7th Cir. 2003) ...................................................................................5

*RJR Nabisco, Inc. v. European Cmty.*,
   579 U.S. 325 (2016)............................................................................................ 34-35

*Rushaid v. Pictet & Cie*,
   68 N.E.3d 1 (N.Y. 2016)...........................................................................................27

*Schansman v. Sberbank of Russia PJSC*,
   2021 WL 4482172 (S.D.N.Y. Sept. 30, 2021).........................................................29

*Strauss v. Credit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) .........................................................................37

*Suez Water N.Y. Inc. v. E.I. Du Pont Nemours Co.*,
   2022 WL 36489 (S.D.N.Y. Jan. 4, 2022) ................................................................14

*Sunward Elecs., Inc. v. McDonald*,
   362 F.3d 17 (2d Cir. 2004).................................................................................32, 35

*Tamam v. Fransabank SAL*,
   677 F. Supp. 2d 720 (S.D.N.Y. 2010).....................................................................28

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019).......................................................................13, 31, 36

*Universal Trading & Inv. Co., Inc. v. Tymoshenko*,
   2012 WL 6186471 (S.D.N.Y. Dec. 12 2012) ..........................................................30

*Walden v. Fiore*,
   571 U.S. 277 (2014).............................................................................................20, 21

## **Statutes**

Federal Rule of Bankruptcy Procedure 7004 ..................................................................13

Federal Rule of Bankruptcy Procedure 7012 .................................................................................1

Federal Rule of Civil Procedure 12(b)(2) ..........................................................................1, 12, 13

**<u>Other Authorities</u>**

*Incidental*, Black's Law Dictionary (11th ed. 2019) ....................................................................28

Jason Szep, *Savings Lost to Madoff, Elderly Forced Back to Work*, Reuters
    (Feb. 6, 2009) ............................................................................................................................1

Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma" and, together with Sentry, the "Funds") in the above-captioned adversary proceeding (together, with the other adversary proceedings now pending against the Funds' former shareholders, the "U.S. Redeemer Actions"), respectfully submit this memorandum of law in opposition to HSBC Securities Services (Luxembourg) S.A.'s ("HSSL") motion to dismiss the Fourth Amended Complaint ("Complaint" or "Compl.") (Dkt. 167)[1] under Federal Rule of Civil Procedure 12(b)(2) as made applicable here by Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Motion" or "Mot.").

## PRELIMINARY STATEMENT

The Liquidators seek to recover at least $84 million in payments[2] that HSSL received as redemptions of its investment in Bernie Madoff's Ponzi scheme on behalf of its clients. Several Fairfield investors saw their life savings, retirement funds, and pensions wiped out in an instant when the scheme collapsed in December 2008.[3] But as a sophisticated entity with inside knowledge about Madoff's fraud, HSSL was able to get out early and reap a massive profit for itself and its clients before Madoff's investment firm was put into bankruptcy. HSSL now attempts to evade responsibility by minimizing its own substantial and purposeful connections with the

---

[1] Unless otherwise specified, docket citations refer to filings in the above-captioned action.

[2] HSSL received $80,569,316.23 from Sentry and approximately €2,824,225.24 from Sigma through the redemption payments at issue. For purposes of this brief, the Liquidators have applied the exchange rate as of the date of each redemption payment out of Sigma and calculated the dollar value of the Sigma redemptions to be approximately $3,828,519.74. This number may vary if the Court ultimately determines that a different exchange rate applies.

[3] *See generally* Jason Szep, *Savings Lost to Madoff, Elderly Forced Back to Work*, Reuters (Feb. 6, 2009), https://www.reuters.com/article/us-madoff-victims/savings-lost-to-madoff-elderly-forced-back-to-work-idUSTRE5156FB20090207.

U.S.; HSSL should be held to account and its motion to dismiss denied.

The facts relevant to this motion are simple. When HSSL withdrew its investment from two Fairfield Funds, it received inflated redemption payments that were substantially sourced from investors' monies that Fairfield had invested in Madoff's eponymous New York investment firm Bernard L. Madoff Securities LLC ("BLMIS"), through which Madoff operated his Ponzi scheme. ███████████████████████, at the expense of other investors, to receive redemption payments from the Funds—the same redemption payments the Liquidators seek to recover in this action—HSSL deliberately and repeatedly utilized U.S. bank accounts. HSSL knew where its investments were going: it took these actions after it and its affiliates conducted due diligence on and received offering materials informing them that their investments would be placed with BLMIS for the purpose of trading in the U.S. securities market. HSSL is subject to this Court's jurisdiction as a result of that conduct.

For the Court to exercise specific jurisdiction over a defendant, the defendant must have sufficient contacts with the forum that relate to the claims at issue, and the exercise of jurisdiction must be reasonable. HSSL's extensive, intentional contacts with the U.S. more than sufficiently support this Court's exercise of jurisdiction over HSSL.

*First*, HSSL's contacts with the U.S. were voluminous and are directly related to the Liquidators' claims. For example, HSSL:

- Subscribed for ████████ shares in Sentry and Sigma worth approximately ████████,[4] with the sole purpose of investing in U.S.-based BLMIS and after

---

[4] The value of HSSL's Sigma subscriptions is calculated as discussed above, *see supra* note 2.

reviewing private placement memoranda ("PPMs") ███████████████████
████████████████████ ;[5]

- Utilized U.S. correspondent accounts[6] on at least ███████████████████
  ██████████ and to receive 10 redemption payments from Sentry, worth a total of
  $80,569,316.20;

- Conducted due diligence within and aimed at the United States in connection with its
  investment in the Funds and discussed its relationship with BLMIS internally and with
  its affiliates at length;

- Signed ██ subscription agreements subjecting it to the laws and jurisdiction of New
  York; and

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████ .

Courts have held that contacts nearly identical to these support the exercise of personal

jurisdiction. Indeed, this Court recently found personal jurisdiction existed based on similar

investments in the Funds in actions brought by the BLMIS Trustee.[7] And these contacts directly

relate to the crux of the Liquidators' claims: that HSSL redeemed its Fund shares knowing that the

payments it would receive in return would be inflated due to inaccurate and fraudulent value

statements. Without these U.S. contacts, there would have been no investment, no redemption, and

no benefit to HSSL. The factual nexus between HSSL's forum contacts and the Liquidators' claims

more than sufficiently supports the exercise of specific personal jurisdiction.

*Second*, this Court's exercise of personal jurisdiction over HSSL is more than reasonable

---

[5] Throughout this brief, the Liquidators refer to HSSL's "investment" with BLMIS. The
Liquidators do not allege that HSSL was invested in BLMIS itself, but instead refer to HSSL's
investment in BLMIS by way of the Funds.

[6] "Correspondent accounts are accounts in domestic banks held in the name of foreign financial
institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian
Bank, SAL* ("*Licci II*"), 673 F.3d 50, 56 n.3 (2d Cir. 2012) (cleaned up).

[7] *See, e.g.*, *Picard v. Cathay Life Ins. Co.* (*In re Bernard L. Madoff*) ("*Cathay Life Ins.*"), 2022 WL
16626325 (Bankr. S.D.N.Y. Nov. 1, 2022); *Picard v. Barfield Nominees Ltd.* (*In re Bernard L.
Madoff*) ("*Barfield*"), 2022 WL 4542915 (Bankr. S.D.N.Y. Sept. 28, 2022).

and allowing the suit to proceed is consistent with notions of fair play and substantial justice. The United States has a substantial interest in this dispute, as it concerns HSSL's deliberate choice to invest tens of millions of dollars in—and wrongfully profit from—a fraudulent scheme in the U.S. securities market and to use the U.S. banking system to pull it off at the expense of other investors. Any burden HSSL faces as a litigant in this forum is minimal at best and can be mitigated through electronic transmission of document productions and redactions to address asserted privacy concerns arising from foreign law. HSSL has not come close to meeting its burden of presenting a compelling case that exercising jurisdiction would be unreasonable.

This Court should deny HSSL's Motion and reach the merits of the Liquidators' claims.

## **BACKGROUND**

### A.    The Funds

Sentry and Sigma—along with non-party, Fairfield Lambda—were collectively the largest BLMIS "feeder funds," funneling billions of dollars into New York-based BLMIS over 18 years. Compl. ¶¶ 6, 42-43. From their inception in 1990 until the widespread disclosure of Madoff's fraud in December 2008, the Funds sought out new investments through the sale of shares and transferred substantially all net proceeds to their New York accounts, which were managed by BLMIS. *Id.* ¶¶ 5, 26-27. Sentry transferred its proceeds directly to BLMIS in New York, while Sigma, established for Euro-denominated investments, transferred proceeds to Sentry. *Id.* ¶¶ 5, 42.

### B.    HSSL's Investment In The Funds



. Konanova Decl. Ex. 1 (                                    );[8]

---

[8] Unless indicated otherwise, all exhibits refer to those attached to the Declaration of Lena Konanova ("Konanova Decl.") filed contemporaneously herewith.

4

*see also* Compl. ¶ 56.[9] From ████████, through January 28, 2008 (the "Subscription Period"), HSSL subscribed for a total of approximately ████████ shares between the two Funds. Compl. ¶ 22; *see also* Exs. 78-81 (████████████████████████████).[10] In connection with those subscriptions, HSSL entered into at least ██ individual subscription agreements. *E.g.*, Exs. 3 at HSSL-FF-00000647-667; 4 at PSL0204-215; 5 at ANWAR-CFSE-00340438, -448; 6 at HSSL-FF-00000621 (████████████████████████████).[11]

HSSL knew where the money was going when it made these investments: HSSL and its affiliates conducted an extensive investigation about the Funds and BLMIS to evaluate their prospect as potential investment targets, all while knowing the Funds were designed to invest in New York-based BLMIS and thereby exploit the U.S. securities market. As part of this investigation, HSSL engaged in due diligence over eight years and was well aware of the

---

[9] HSBC Bank plc ("HSBC Bank") acquired Bank of Bermuda Limited, which owned BoB Lux, in 2004, and BoB Lux changed its name to HSSL later that year. *See* Stipulation and Order, *In re Bernard L. Madoff Inv. Sec. LLC*, 09-01364, ECF No. 130 (Bankr. S.D.N.Y. Sept. 12, 2011); *see also* HSSL 2004 Annual Report at 3, *available at* https://gd.lu/rcsl/87KnbH. Any conduct or knowledge of BoB Lux are attributable to HSSL. *See Linzer v. EMI Blackwood Music, Inc.*, 904 F. Supp. 207, 213 (S.D.N.Y. 1995) ("A successor-in-interest may be subject to jurisdiction based on the activities of its predecessor … [conditioned on] that the predecessor and successor be one and the same and that the predecessor continue to exist as part of the successor."); *see also Purdue Res. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003) (recognizing that "the jurisdictional contacts of a predecessor corporation may be imputed to its successor corporation without offending due process"). Indeed, the BoB Lux employees that led its diligence efforts— Germain Birgen, Nigel Fielding, Saverio Fiorino, and Christopher Wilcockson—stayed with HSSL after BoB Lux became HSSL, retaining their knowledge about the Funds and BLMIS. *See* Ex. 2 at HBUS-FF-00020607 (██████████████████████████████████████████████. The Liquidators therefore refer to both BoB Lux and HSSL collectively as "HSSL."

[10] The total value of all HSSL subscriptions the Liquidators have identified is ████████████. In the Complaint, the Liquidators allege subscriptions for $42,382,500.56 for 43,322.27 shares from 2005 to 2008. Compl. ¶ 22. ████████████████████████████████████████████████████.

[11] The current record does not reflect an associated subscription agreement for each of HSSL's subscriptions ████████.

relationship between the Funds and BLMIS. For example, as early as 2001, a high-ranking employee of HSSL laid out his concerns about HSSL's inability to verify the Funds' assets due to the fact that BLMIS simultaneously served multiple roles (a sub-custodian, an investment manager, and a broker-dealer) for the Funds. Compl. ¶ 60; Ex. 7 at 1, 195:14-20 (trial transcript quoting HSSL email describing "concerns" regarding "no 'Chinese' walls" at BLMIS).[12]

The record also reveals that HSSL had numerous contacts within and aimed at the U.S. concerning the Funds and BLMIS throughout the Subscription Period. HSSL executives personally visited Madoff in his New York office at least twice, in 2002 and 2004 (as explained in the following paragraph); communicated with HSSL's U.S. affiliate, HSBC USA N.A. ("HBUS"), and KPMG (retained by HSSL's parent company, HSBC Bank, to audit BLMIS, as explained below) about their meetings with Madoff in New York, *see infra* pp. 7-8, 33; ██████████

████████████████████████████████████████████████████████████████

████████████, *see infra* pp. 32-33.

In particular, in 2002, HSSL executive Nigel Fielding met with Madoff in his New York office ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████. *See* Ex. 10 (██████████████████████); Ex. 11 (███████████████); *see also* Ex. 12 (██████████████████████████████████).[13]

---

[12] Exhibits 7, 8 and 9 contain excerpts from trial transcripts in *Primeo Fund (In Official Liquidation) v. Bank of Bermuda (Cayman) Ltd.* [2017] (2) CILR 334, an action by another Madoff feeder fund in liquidation against HSSL and Bank of Bermuda (Cayman) Ltd.

[13] Exhibits 10 and 11 identify ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



███████████████████████████████████████████████████████████████████

████████████████████████████. Ex. 11 (█████████████); *see also* Ex. 17 (████████

██████████████████████████████████████). In 2004, Fielding returned to

BLMIS's New York office with Wilcockson, where the two conducted another "[d]ue diligence

meeting with B. Madoff" in connection with HSSL's services to certain BLMIS feeder funds. Ex.

18 (█████████████████); Ex. 19 (████████████████████████).[14]

HSSL's diligence also included collaborations with affiliates within the HSBC corporate

family. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 20 at HBUS-FF-

00020591. ███████████████████████████████████████████████████████████

████████████████████████████████████████████████. *Id.* at -

591-592.

HSSL's parent company, HSBC Bank, also engaged KPMG to audit BLMIS in 2005 for

the benefit of itself and its affiliates, including HSSL. Compl. ¶ 113; Ex. 21 (████████████

████████████████████████████████████████████████████). ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████. *E.g.*, Ex. 22 at HBUS-FF-

00023131; *see also* Exs. 23-24. ███████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[14] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ *See* Ex. 16 at
HBUS-FF-00020758 (████████████████████████████████████████████████████
███████████████████████████. ███████████████████████████████████████████████
██████████ *Compare* Ex. 16 at -759 *with* Ex. 49 at HSSL-FF-00000991.

██████████████████████ Ex. 25 at HBUS-FF-00025262; *see also* Ex. 26. HSSL received

the final KPMG report and therefore received the benefit of KPMG's on-site visit to BLMIS in

New York. *See* Ex. 27 (██████████████████████); Exs. 28-29 (██████████████████████

██████████████████████).

Moreover, HSSL served as the administrator and custodian of non-Fairfield BLMIS feeder

funds, including Primeo, Thema, Herald, and Alpha Prime. *See* Ex. 12. In providing those services,

HSSL became familiar with a structure that was commonly adopted by BLMIS feeder funds:

funneling money to an account at BLMIS so that the money would be managed by BLMIS. The

Funds adopted a virtually identical structure, *see supra* Section I.A, and, therefore, HSSL was well

aware that investing in the Funds was akin to investing in BLMIS.



██████████████████████. *E.g.*, Ex. 30 (██████████); Ex. 31

(██████). ██████████████████████

██████████████████████

██████ Ex. 31 at FG-05552287; *accord* Ex. 30 at FG-05554163. ██████████

██████████████████████

██████████████████████.

Ex. 30 at -155, -162; *see also* Ex. 31 at -278-279. In other words, the offering materials made clear

that the main purpose of the Funds' existence was to invest in BLMIS██████████████

██████████████ *See, e.g.*, Ex. 30 at -149 (██████████████

██████████████████████

██████████████████████); Ex. 31

at -272 ( ██████████████████████████████████████████████████
████████████████████████████ ).

HSSL invested in the Funds by signing a "long form" subscription agreement specific to each Fund prior to its initial subscription. *E.g.*, Ex. 3 (Sentry); Ex. 4 (Sigma).[15] ████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██. Ex. 3 at -653 ¶ 7; Ex. 4 at -207 ¶ 7. ███████████████████████
█████████████████████████████████████████████████████████.
*E.g.*, Ex. 5 at -438, -448 ( ███████████████ ) ( ████████████████████
████████████████████████████████████████████████ ); Ex. 6 at
-621 ( ████████████████ ) ( █████ ).
███████████████████████████████████████████████
█████████████████████████████████████████████████████. *E.g.*,
Ex. 30 at -160; Ex. 3 at -647-649; Ex. 5 at -692. ████████████████████
██████████████████████████████████████████████.

The long form subscription agreements required HSSL to ████████████████████
██████████████████████████████████ and to choose an account through which it would receive payments for redemption of its shares. Although HSSL was free to designate an account anywhere in the world, *see* Declaration of Sara Joyce ("<u>Joyce Decl.</u>") at 6-9, 11-13, HSSL *chose* to use a U.S.-based account ( ██████████████████████████████████████████

---

[15] The long form subscription agreements included provisions designating New York law as the governing law and New York as the venue for dispute resolution. Ex. 3 at HSSL-FF-00000655 ¶ 16, -657 ¶ 19; Ex. 4 at -209 ¶¶ 17, 20; *see also* Compl. ¶ 23 (alleging that HSSL submitted to the jurisdiction of New York).

██████████████████████████████ ) ████████████████████████ *and* to receive its redemption payments. *E.g.*, Ex. 5 at -690; Ex. 3 at -667 (████████████████ ████████████████████████████████████████████ ); Ex. 1 (████████████████████████████████████████████ ██████████████████████ ).

████████████████████████ , HSSL intentionally and knowingly chose to utilize U.S.-based accounts to ████████████████████ and to receive redemption payments arising from its investment in the Funds. *See, e.g.*, Ex. 1 (██████████████████████ ); Ex. 32 (████████████████████ ██████ ); Ex. 3 at -667 (████████████████████████ ); Ex. 33 (████████████████████ ); Ex. 34 (██████████████████████ ).[16]

The subscription agreements were not the only places where HSSL was required to choose an account at which it wished to receive its redemption payments. ██████████████████████████ ██████████████████████████████████████████ . While HSSL was free to choose an account outside the U.S., Joyce Decl. at 6-9, 11-13, for each redemption, HSSL again designated a U.S.-based (rather than foreign) correspondent bank account ██████████████████████████ ██████████████ .



Ex. 33 at HSSL-FF-00000367 (██████████████████████████ ).

██████████████████████████████████████████████ and HSSL received each Sentry redemption payment at its designated accounts at ██████████████ , as in

---

[16] HSSL does not suggest in its Motion that anyone other than HSSL retained discretion over what account to use for these purposes.

the example below:



Ex. 35 at ANWAR-CFSE-00214527 (███████████████████) (annotation added); *see also* Ex. 32 (███████████████████). From April 8, 2004, through September 16, 2008 (the "<u>Redemption Period</u>"), HSSL requested (and the Funds processed) 11 redemptions and HSSL received payments totaling $84,397,835.97. Compl. ¶ 49; *e.g.*, Ex. 32 (2004 redemption); Ex. 33 (2006 redemption); Ex. 34 (2008 redemption). Setting aside the one Sigma redemption, Sentry wired 10 redemptions totaling $80,569,316.20—roughly 95% of the money HSSL received from the Funds—to the U.S. accounts, ███████ ██████████████████████████████████████. Compl. Ex. A; *see also* Exs. 62-77.[17]

████████████████████████████████████████

██████████████████████████████. *See, e.g.*, Ex. 39 at HSSL-FF-00000590-592 (███████████████████████████████████

---

[17] The Liquidators are no longer asserting a claim on the September 27, 2005 redemption of 621.47 Sentry shares for $100,000. All amount figures herein do not include this $100,000 redemption.

██████████████████████████).[18]

**STANDARD**

Courts in this Circuit apply one of three standards to Rule 12(b)(2) motions. If the motion is assessed solely on the pleadings, the plaintiff may defeat the motion based on legally sufficient allegations alone. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566-67 (2d Cir. 1996), *cert. denied*, 519 U.S. 1007 (1996). If discovery is permitted *and* the court holds an evidentiary hearing, "the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence." *Id.* at 567. And where, as here, the court assesses the motion after jurisdictional discovery but *without* holding an evidentiary hearing, the plaintiff need only make a factually supported *prima facie* showing of jurisdiction. *See id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Obabueki v. Int'l Bus. Machines Corp.*, 2001 WL 921172, at *2 (S.D.N.Y. Aug. 14, 2001).

In this context, the court must credit the facts averred in the pleadings and motion papers as true and must "construe[] the pleadings and affidavits in the light most favorable to the plaintiff … resolv[ing] all doubts in plaintiff's favor, notwithstanding any 'controverting presentation by the moving party.'" *McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani*, 295 F. Supp. 3d 404, 409 (S.D.N.Y. 2017) (quoting *Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85-86 (2d Cir. 2013)); *accord Drake v. Lab. Corp. of Am. Holdings*, 2008 WL 4239844, at *1 (E.D.N.Y. Sept. 11, 2008) ("Despite this higher burden, the Court must 'credit [Plaintiff's] averments of

---

[18] ██████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████ *See, e.g.*, Exs. 37-38. ██████████████████████
████████████████████████████████████████████████████████
████████████████████████████ . *See, e.g.*, Ex. 39 at -590-592.

jurisdictional facts as true.'" (quoting *Metro. Life Ins. Co.*, 84 F.3d at 567)). Likewise, the court

must draw "reasonable inference[s]" in the plaintiff's favor based on facts developed in discovery.

*Drake*, 2008 WL 4239844, at *5; *see also Obabueki*, 2001 WL 921172, at *1 (stating that the court

must draw reasonable inferences in the plaintiff's favor notwithstanding the fact that the parties

had engaged in jurisdictional discovery).[19]

## ARGUMENT

This Court has personal jurisdiction over HSSL because HSSL has sufficient minimum

contacts with the United States and because the exercise of jurisdiction over HSSL is reasonable.

## I.    HSSL Has Sufficient Minimum Contacts With The United States

HSSL has sufficient minimum contacts with the United States to permit this Court to

exercise jurisdiction over it. Jurisdiction under Bankruptcy Rule 7004 is assessed based upon the

defendant's "contacts with the United States, rather than with the forum state," and there is no

need for the Court to address the forum state's long-arm statute. *Picard v. Fairfield Greenwich*

*Grp.* (*In re Fairfield Sentry Ltd.*) ("*FGG*"), 627 B.R. 546, 565 nn.12, 13 (Bankr. S.D.N.Y. 2021)

(citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)).

Demonstrating the requisite minimum contacts for specific personal jurisdiction requires showing

(1) a defendant's "purposeful availment" of the forum (2) that "arises out of or relates to" the

alleged misconduct. *FGG*, 627 B.R. at 566; *see also Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 472, 475 (1985); *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019)

(citing *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1785-86 (2017)). Courts

---

[19] The Liquidators have not pursued discovery on the merits from HSSL, including, for example, documents demonstrating that HSSL knew the Funds' net asset values were inflated. To the extent the Court considers those allegations in resolving HSSL's Rule 12(b)(2) motion, it should credit those allegations as true per the standard applicable in the absence of jurisdictional discovery. *See Metro. Life Ins. Co.*, 84 F.3d at 566-67.

13

assess both prongs based on the "totality of the circumstances." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci IV*"), 732 F.3d 161, 170 (2d Cir. 2013).

Satisfying the first prong, "purposeful availment," requires showing that the defendant has sufficient contacts with the forum resulting from the defendant's own actions. *FGG*, 627 B.R. at 566. The defendant's activities "need not have taken place within the forum, and a single transaction with the forum will suffice." *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (cleaned up) (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

Satisfying the second prong, "arises out of or relates to," requires showing that there is a "sufficiently close link" between the defendant's contacts and the claims at issue. *MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29 2021) (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1032 (2021)). A causal relationship between the plaintiff's claims and the defendant's forum contacts is *not* required. *See, e.g.*, *Cathay Life Ins.*, 2022 WL 16626325, at *4 (citing *Ford Motor Co.*, 141 S. Ct. at 1027). An "affiliation between the forum and the underlying controversy" is sufficient. *Cathay Life Ins.*, 2022 WL 16626325, at *4 (quoting *Goodyear Dunlap Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also Suez Water N.Y. Inc. v. E.I. Du Pont Nemours Co.*, 2022 WL 36489, at *8 (S.D.N.Y. Jan. 4, 2022) (holding that the claims must be "arguably connected" to, rather than "completely unmoored" from, the contacts at issue (quoting *Licci v. Lebanese Canadian Bank, SAL* ("*Licci III*"), 984 N.E.2d 893, 900-01 (N.Y. 2012))).

The facts averred and evidence presented by the Liquidators, which must be taken as true for purposes of this motion, are sufficient to satisfy both prongs of the minimum contacts test. HSSL purposefully availed itself of the United States by intentionally investing in BLMIS feeder

funds Sentry and Sigma with the express intention of profiting from BLMIS's investments in the U.S. securities market (**Section I.A**, *infra*), repeatedly directing funds into U.S.-based correspondent accounts at ███████████ to effectuate ███████████████ the redemptions from Sentry (**Section I.B**, *infra*), and engaging in other business activity within and aimed at the United States (**Section I.C**, *infra*). Each of those contacts is closely related to the Liquidators' claims. HSSL therefore has sufficient minimum contacts with the United States.

### A.      HSSL Knowingly And Intentionally Invested In Madoff Feeder Funds

The facts averred and evidence presented by the Liquidators make clear that HSSL intentionally invested in BLMIS feeder funds Sentry and Sigma knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS. HSSL is subject to this Court's jurisdiction with respect to its Sentry and Sigma redemptions as a result of that conduct.

### 1.      HSSL Purposefully Availed Itself Of The United States Via Its Intentional Investment In The Funds

This Court, applying Judge Lifland's decision in *Picard v. Bureau of Labor Ins.* (*SIPC v. Bernard L. Madoff Inv. Secs. LLC*) ("*BLI*"), 480 B.R. 501, 517 (Bankr. S.D.N.Y. 2012), recently held that "[a] party 'purposefully avail[s] itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS.'" *Cathay Life Ins.*, 2022 WL 16626325, at *3. *BLI* applies with at least equal force here.

In *BLI*, Judge Lifland held—in a very similar action seeking to reclaim redemption payments made by the same Fairfield Sentry fund—that a foreign defendant "purposefully availed itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York securities market." 480 B.R. at 517. As here, the *BLI*

defendant subscribed in Sentry after engaging in "diligence on Fairfield Sentry and its investment strategies" and after reviewing a PPM "and other information about Fairfield Sentry, including specifics about the Fund's investment strategy and past results and trades in the S&P 100," provided to it by FGG. *Id.* at 517. And, as here, the defendant "signed [a] Subscription Agreement [that] incorporated the [offering memorandum]," meaning the defendant knew "Sentry was required to invest at least 95% of its assets" in BLMIS, which would hold the assets in accounts in New York to be "invested in U.S. Securities…." *Id.*

Since *BLI* was decided, courts repeatedly have employed *BLI*'s reasoning to find jurisdiction in similar circumstances. *See, e.g.*, *Picard v. JP Morgan Chase & Co.* (*In re Bernard L. Madoff Inv. Secs. LLC*), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting that *BLI* "confirmed that defendants who invested directly or indirectly with BLMIS and received payments from BLMIS as initial transferees or as subsequent transferees of those initial transferees [are] subject to the Court's personal jurisdiction"); *Maxam Absolute Return Fund, L.P.*, 460 B.R. at 118 (finding jurisdiction over defendant that "engaged in a series of repeated transactions that intentionally channeled investor money into the BLMIS Ponzi scheme in New York"); *cf. In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Secs. LLC*, 917 F.3d 85, 105 (2d Cir. 2019) ("When these investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going.").

Most recently, this Court cited *BLI* in exercising personal jurisdiction over several defendants in actions brought by the BLMIS Trustee seeking to recoup the very same kind of redemption payments at issue here. *See, e.g.*, *Cathay Life Ins.*, 2022 WL 16626325; *Barfield*, 2022 WL 4542915. This Court did so after citing allegations of the same facts presented here: that the defendant "knowingly directed funds to be invested with New York-based BLMIS through

16

Fairfield Sentry"; that Sentry "invested almost all of its assets in BLMIS"; that the defendant reviewed PPMs substantively identical to those at issue in *BLI*; that the defendant signed subscription agreements incorporating the same; and that the defendant communicated with FGG employees in New York. *Compare Cathay Life Ins.*, 2022 WL 16626325, at *3, *and Barfield*, 2022 WL 4542915, at *3, *with* Compl. ¶ 20 (alleging that HSSL invested in the Funds while knowing and intending that its investments would be passed along to BLMIS), Exs. 10-11, 18-19 (██████

██████████████████), *and* Ex. 40 (███████████████████). In light of these allegations, this Court held that defendants "intentionally directed its investment to New York-based BLMIS, through Fairfield Sentry," which in turn was a basis for exercising personal jurisdiction pursuant to *BLI. Picard v. Banque Lombard Odier & Cie SA* (*In re Bernard L. Madoff*) ("*Lombard Odier*"), 2022 WL 2387523, at *3 (Bankr. S.D.N.Y. June 30, 2022); *see also Cathay Life Ins.*, 2022 WL 16626325, at *3.

Here, the Funds' offering documents (virtually identical to those at issue in *BLI*, *Cathay Life Insurance*, *Lombard Odier*, and others), as well as HSSL's own due diligence during the Subscription Period, all demonstrate that HSSL, a sophisticated investor, invested millions in Sentry and Sigma with the intention, knowledge, and expectation that its investment would be channeled into BLMIS and that it would thereby profit from Madoff's fraud. Under *BLI* and this Court's recent decisions, that defeats HSSL's Motion.

Specifically, as in *BLI*, PPMs for both Sentry and Sigma informed HSSL that it was making an indirect investment in New York-based BLMIS. The PPMs explained that:

1.   ████████████████████████████████████
████████████████████████████████████
█████████ Ex. 30 at -149; Ex. 31 at -272 ██████
████████████████████████████████████.

2.  . Ex. 30 at -156, -162.[20]

3. . Ex. 30 at -161-162.

4. *See* Ex. 30 at -155.

.

Ex. 3 at -647 ¶¶ 1-2, -653 ¶ 7; Ex. 4 at -204 ¶¶ 1-2, -207 ¶ 7; *see also BLI*, 480 B.R. at 517 ("BLI signed the Subscription Agreement, which incorporated the PPMs.").[21] And, as a result of its own extensive due diligence during the Subscription Period, HSSL was well aware of the relationship between the Funds and New-York-based BLMIS at the time of its investments in the Funds. Indeed, there is even more evidence in this action that HSSL intended to invest in BLMIS through the Funds than what the court relied upon in *BLI*.

Here, high-ranking HSSL employees were familiar with the BLMIS "feeder fund" structure and discussed concerns with Madoff's multiple roles for the Funds as early as 2001. Ex. 7 at 1, 194:15-22, 195:5-20 (referring to an email from December 2001 in which an HSSL employee described "concerns" about BLMIS); *id.* at 2, 202:2-12 (referring to an email from an executive of an affiliate of HSSL's predecessor addressed to executives at HSSL's predecessor, stating: "[T]here is a major problem as Madoff has custody and control of the assets as well as being executing broker for [a feeder] Fund. . . . [HSSL's predecessor] *presently services a couple*

---

[20] *See, e.g.*, Ex. 31.

[21] The PPM in *BLI* conveyed the same information as those referenced above. *See* No. 11-ap-02732 Dkt. 17, Ex. 4 at 8-9, 14-16.

18

*of Madoff funds.*") (emphasis added); Compl. ¶ 61. HSSL executive Fielding also met with Madoff in New York in July 2002 and March 2004, Exs. 10-11, 18-19; Compl. ¶ 64, and spoke with the auditor of certain BLMIS feeder funds, Ernst & Young, Luxembourg, Ex. 13 at -719. *See also* Ex. 41. These activities armed HSSL with a robust understanding of the journey and the destination of money put in a BLMIS feeder fund and, therefore, HSSL was well aware at the time of its investments that the money it put in the Funds would land in accounts at BLMIS in New York.

Moreover, HSSL did not invest in BLMIS via the Funds casually; rather, HSSL viewed its relationship with Madoff as of paramount importance. *E.g.*, Ex. 8 at 1, 30:15-22 (describing email to Fielding stating "Madoff is really cheesed off with us (BoB) and he may cut the umbilical if we go once more to the well"). Fielding emphasized that "███████████████████████████████ ████████████████████████████████████████████████████████," Ex. 42, and ████████████████████████████████ "████████████████████████████ ████████████████████████████████████████████████████," Ex. 43; *see also* Ex. 44 (██████).

In sum, the Funds' PPMs and HSSL's own diligence "highlighted BLMIS's central role" in the Funds' investment strategy and informed HSSL that, by investing in the Funds, it was effectively investing in BLMIS in New York. *BLI*, 480 B.R. at 517. HSSL thus executed ██ subscriptions while "knowing, intending and contemplating that the substantial majority of funds … would be transferred to BLMIS in New York to be invested in the New York securities market." *Id.* As in *BLI*, that suffices to establish jurisdiction over HSSL. *Id.*; *see also Cathay Life Ins.*, 2022 WL 16626325, at *3.[22]

---

[22] Even assuming HSSL could demonstrate that it invested in the Funds only on instruction from its clients (which it has not done), HSSL cannot evade responsibility on that ground. Client

HSSL's attempts to distinguish *BLI* fail.

*First*, HSSL attempts to avoid *BLI* on the ground that it involved an action brought by the BLMIS Trustee. *See* Mot. 13-14. This argument gets HSSL nowhere. *BLI* did not turn upon the degree of separation between the plaintiff and the defendant but on the defendant's *knowledge* that it was investing in BLMIS and *intent* to profit from the U.S. securities market via that investment which the *BLI* defendant made by investing in Sentry, just like HSSL here. *See* 480 B.R. at 517.

*Second*, HSSL incorrectly asserts that the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014), bars jurisdiction here. Mot. 11-12. *Walden* does no such thing. The *Walden* Court held there was no jurisdiction because, unlike HSSL here, the defendant did not do anything to avail himself of the benefits and protections of the forum. In *Walden*, the defendant was a Georgia police officer who searched the plaintiffs and physically seized cash from them while they were passing through the state. The plaintiffs attempted to sue the officer in their home state of Nevada, arguing that jurisdiction existed on the basis that the officer knew the plaintiffs were Nevada residents. 571 U.S. at 288-91. The Supreme Court rejected that theory, stating that "the plaintiff cannot be the *only* link between the defendant and the forum," as "the defendant's conduct … must form the necessary connection with the forum State." *Id*. at 289 (emphasis added). In so concluding, the Court relied on the fact that the defendant "never traveled to, conducted activities within, *contacted anyone in, or sent anything* or anyone to Nevada." *Id*. (emphasis added).

By contrast, the Liquidators do not argue (and *BLI* did not hold) that HSSL is subject to jurisdiction because of the Funds' own contacts with the U.S., or HSSL's knowledge of those

---

instructions would not erase HSSL's extensive U.S.-directed conduct in connection with its intentional investment in the Funds. And, in any event, HSSL would have made the choice in the first instance to execute those investments on behalf of its clients and would have done so while knowing the investments were ultimately targeted at the U.S.

contacts, or the mere foreseeability that the money they invested in the Funds would end up in the U.S. Rather, as explained above, HSSL invested in the Funds ███████████████████ ███████████████████████████████████████████████████, Ex. 30 at -156; Ex. 31 at -279, not that the Funds *might* "decide[] to make investments" in the U.S., Mot. 13, and it did so with the *express aim* of having those investments placed in the U.S. to take advantage of the U.S. securities market. And HSSL did all of this after conducting due diligence in and aimed at the U.S. directly in connection with that investment. *See supra* p. 18-19. Moreover, as explained below, HSSL used U.S. accounts to effectuate most of these investments.

That conduct is not attributable to the Funds, nor are the resulting contacts "random, fortuitous, or attenuated." *Walden*, 571 U.S. at 286 (quoting *Burger King Corp.*, 471 U.S. at 475). Rather, jurisdiction here, as in *BLI*, stems directly from HSSL's own deliberate actions aimed at the U.S. Even after *Walden*, Sentry's mere involvement in facilitating some of those actions does not foreclose jurisdiction. *Id.* ("[A] defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties.").[23]

*Third*, HSSL claims the Liquidators' argument depends on a disfavored stream of commerce theory. It does not. Per HSSL's own authority, the stream of commerce theory in the personal jurisdiction context refers to the notion that "a defendant's placing goods into the stream of commerce with the expectation that they will be purchased by consumers in the forum State may indicate purposeful availment." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881-82

---

[23] HSSL also wrongly suggests that *Walden* effectively overruled *BLI*. Mot. 14 n.15. This Court implicitly rejected this contention in *Lombard Odier*, *Cathay Life Insurance*, and similar cases when it applied *BLI* (on which the plaintiff relied) to find jurisdiction based on the defendants' intentional investment in a Madoff feeder fund. *Lombard Odier*, 2022 WL 2387523, at *4; *Cathay Life Ins.*, 2022 WL 16626325, at *3. *BLI* remains good law and supports the exercise of jurisdiction here.

(2011) (cleaned up). That is not the Liquidators' argument.

Rather, the Liquidators argue that HSSL chose to invest in the Funds with the specific

purpose of having its clients' money invested in U.S.-based BLMIS, and that it did so while

████████████████████████████████████████████████████████████████

████████████████████████████████████████. That satisfies the "purposeful

availment" test and is not a stream of commerce argument.

### 2.    HSSL's Intentional Investment In The Funds Directly Relates To The Liquidators' Claims

HSSL's intentional investment in the Funds is directly related to the Liquidators' claims.

To demonstrate a sufficient relationship between its claims and HSSL's forum contacts, the

Liquidators need only show "an affiliation between the forum and the underlying controversy."

*Cathay Life Ins.*, 2022 WL 16626325, at *4. That standard is satisfied here.

HSSL's investments in the Funds were, at their core, a means of investing in a U.S. entity

to take advantage of the U.S. securities market. HSSL fails in its attempt to artificially decouple

HSSL's subscriptions in the Funds from its redemptions. Obviously, the sole purpose for

subscribing for shares of the Funds was to ultimately redeem those shares; otherwise, the Funds

would hold the money in perpetuity. Without the subscriptions HSSL would have had no shares

to redeem and could not have received redemption payments. The two are inextricably linked.

HSSL's subscriptions relate directly to the Liquidators' claims seeking to recoup the value of those

redemptions. Nothing more is needed. *See, e.g.*, *Cathay Life Ins.*, 2022 WL 16626325, at *4.

HSSL asserts that the Liquidators' claims "relate[] to and arise[] out of the calculation of

the NAV … and the [] Funds' subsequent [] disbursement of redemption payments" and, from this

premise, HSSL somehow draws the conclusion that the Liquidators' claims are therefore wholly

unrelated to HSSL's subscription in the Funds. Mot. 10. But that is a non sequitur. Even assuming

22

that the Liquidators' claims relate to the NAV calculation, the claims *also* relate to the subscriptions and redemptions as discussed in the paragraph above. It is thus hardly surprising that this Court rejected the same argument in *Lombard Odier*, where this Court held that "subsequent transfer claims … for monies [defendants] received from Fairfield Sentry … are directly related to [those defendants'] investment activities with Fairfield and BLMIS." 2022 WL 2387523, at *4 (citing *Picard v. BNP Paribas S.A.* (*In re Bernard L. Madoff*), 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018)).[24]

HSSL cannot seek refuge by asserting that the Liquidators have not independently established jurisdiction over every individual subsequent transfer. Addressing this argument in a parallel action brought by the BLMIS Trustee, this Court recently held that "[b]y alleging that Defendant intentionally invested in BLMIS, the Trustee has met his burden of alleging jurisdiction as to each subsequent transfer…." *Id.* at *5. The same result should follow here.

**B.    HSSL Utilized U.S. Correspondent Accounts To Invest In And Receive Redemption Payments From Sentry**

Roughly 95 percent of the redemptions at issue in this case were from Sentry. HSSL's intentional and recurring use of U.S. correspondent accounts to ████████████████████ receive each of the at-issue Sentry redemption payments independently supports the exercise of jurisdiction with respect to those redemption payments. A defendant's use of an in-forum

---

[24] HSSL similarly argues that *Fairfield I* held the subscription agreements were wholly irrelevant to the exercise of personal jurisdiction and bars *BLI*'s application here as law of the case. Mot. 10 (citing *In re Fairfield Sentry Ltd.* ("*Fairfield I*"), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018)). HSSL is flat wrong; *Fairfield I* held that, as a matter of contract interpretation, the New York forum selection clause in the subscription agreements did not amount to consent to jurisdiction in these actions. 2018 WL 3756343, at *10-12. The question of whether those agreements—or the defendants' subscription in the Funds more generally—could support jurisdiction on another basis was not before the court. *Fairfield I* is therefore inapposite as to this issue.

correspondent account is sufficient to establish personal jurisdiction where said use is "deliberate," "recurring," and sufficiently related to the harm for which the plaintiff seeks redress. *Licci IV*, 732 F.3d at 171-73. HSSL's correspondent account use satisfies each of those three prongs.[25]

### 1.    HSSL Deliberately Utilized U.S. Correspondent Accounts In Lieu Of Offshore Accounts

HSSL's correspondent account use was deliberate. A defendant's correspondent account use is "deliberate" if it "indicates desirability and a lack of coincidence." *Licci IV*, 732 F.3d at 168 (quoting *Licci III*, 984 N.E.2d at 901). HSSL's choice to use U.S. correspondent accounts in effectuating its ██████████ redemption payments was a conscious and volitional one—not mere coincidence—that supports the exercise of jurisdiction. *See, e.g.*, *Picard v. Meritz Fire & Marine Ins. Co. Ltd.* (*In re Bernard L. Madoff*), 2022 WL 3273044, at *3 (Bankr. S.D.N.Y. Aug. 10, 2022) ("Where a defendant chooses to use a United States bank account to receive funds, exercising personal jurisdiction over the defendant for causes of action relating to those transfers is constitutional."); *Cathay Life Ins.*, 2022 WL 16626325, at *3.



██████████. Ex. 32 at -335; *see also* Ex. 1; Ex. 3 at -667; Ex. 5 at -431, -434-436; Ex. 33. On the redemption side, HSSL voluntarily chose to designate U.S. accounts █ ██████████ to receive the redemption payments from Sentry. *Id.*; Ex. 32 at -334-336. HSSL had complete control over which account it used for these transfers. *See* Joyce Decl. at 11-13 (concluding that Fairfield Sentry investors could have used foreign, U.S. dollar denominated correspondent accounts to ████ receive ██████████ redemption payments, ██████,

---

[25] While HSSL did not designate a U.S. correspondent account for its redemption of Sigma shares, it is still subject to jurisdiction with respect to those transactions, as the Liquidators' jurisdictional theories detailed in Sections I.A, *supra*, and I.C, *infra*, do not turn on correspondent account use.

without employing correspondent banking services in the U.S.). ███████████████

████████████████, and Sentry wired those payments to those U.S. accounts *solely because*

HSSL made the choice to use U.S. accounts and instructed that the payments be sent ████ to

those accounts.

████████████████████████████████████████████████████████

████████████████████████████████████. Courts have held that a

defendant's transfer of monies to a third-party's U.S. account can support the exercise of

jurisdiction. *See Lombard Odier*, 2022 WL 2387523, at *4; *Off. Comm. of Unsecured Creditors of*

*Arcapita v. Bahrain Islamic Bank* ("*Arcapita I*"), 549 B.R. 56, 68-69, 70 n.18 (S.D.N.Y. 2016)

(holding that the defendant's use of a third-party's U.S. correspondent account is a jurisdictionally

significant contact). ████████████████████████████████████████████

████████████████████████. Ex. 30 at -160. ████████████████████████

████████████████████████████████████████████

██████████████████. HSSL nonetheless *chose* Sentry rather than investing in a different fund

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.

HSSL's attempts to minimize the significance of its use of U.S. accounts fail.

*First*, contrary to HSSL's suggestion that it had no choice but to use a U.S. account, Mot.

18-19, ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. *See* Joyce Decl. at 11-13.

HSSL nevertheless *chose* to utilize accounts at ████████████████ to effectuate ████████████

25

█ redemption-side transfers.

Also contrary to HSSL's suggestion, Mot. 16-17, HSSL was not required to use a U.S. correspondent account simply because Sentry designated U.S. dollars as its base currency. *See* Joyce Decl. at 11-13. ████████████████████████████████████████████████████

████████████████████████████████. *See* Ex. 3 at -655 ¶ 9; Ex. 46 (Sentry Articles of Association) at 9 ¶ 10(1)(c) (requiring only that "payment shall be made to the Applicant in the Base Currency in respect of the redemption or purchase of Shares" by way of "cheque, draft, wire transfer or other means of payment posted"). Further, the Second Circuit has recognized that, "[i]n light of the widespread acceptance and availability of U.S. currency, [a foreign bank] could have … processed U.S.-dollar-denominated wire transfers … through correspondent accounts anywhere in the world." *Licci IV*, 732 F.3d at 171.

In any event, even assuming *arguendo* that Sentry being a U.S. dollar-based fund somehow "necessitated" the use of a U.S. account (it did not), HSSL would have been well aware of that fact when it chose to invest in Sentry, as opposed to some other fund. HSSL thus still voluntarily and purposefully *chose* to make investments knowing that doing so would require using New York's banking system, making HSSL's use of U.S. accounts to effectuate its subscription and redemption payments deliberate even under HSSL's framing of the facts.

HSSL's reliance on *Arcapita I* to suggest otherwise is misplaced. Mot. 17-18. *Arcapita I* found jurisdiction over a foreign bank's receipt of a single transfer via a third-party's correspondent account. 549 B.R. at 68-69. In dicta, the court suggested that it may have reached a different outcome if the defendant itself had not selected U.S. dollars as the currency for the transaction. *Id.* at 71. But that same court recently clarified that it could exercise personal jurisdiction over the foreign bank even if the transferee, not the defendant, "wanted to [transact]

in U.S. dollars" because the defendant "*chose to accept those terms* and then *designated correspondent bank accounts in New York* to receive the fund transfers." *In re Arcapita Bank B.S.C.(C)* ("*Arcapita II*"), 2022 WL 1620307, at *6 (S.D.N.Y. May 23, 2022) (emphasis added).

*Second*, HSSL mischaracterizes its receipt of redemption payments as "passive conduct." Mot. 15. But, as noted above, HSSL's redemption payments were wired to U.S. accounts *only because* HSSL chose those accounts and actively instructed Sentry to send payments there.[26]

*Third*, HSSL incorrectly asserts its use of correspondent accounts was "entirely incidental" to the "[Liquidators'] claims about a breach by Citco Fund Services" and to the "principal wrong" alleged, as in *Hill v. HSBC Bank PLC*, 207 F. Supp. 3d 333 (S.D.N.Y. 2016), and *Hau Yin To v. HSBC Holdings PLC*, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017). Mot. 16-19. But the truth is the exact opposite. To begin with, the wire transfers here are at the core of the Liquidators' claim because, in order to recover the inflated redemption payments from HSSL, the Liquidators must show that HSSL received them. *In re Fairfield Sentry Ltd.* ("*Fairfield II*"), 596 B.R. 275, 301 (Bankr. S.D.N.Y. 2018). Moreover, in *Licci IV*, the Second Circuit held that the defendant's "selection and repeated use of New York's banking system as *an instrument for accomplishing the alleged wrongs* for which the plaintiff seeks redress, constitutes purposeful availment of the

---

[26] It is irrelevant whether HSSL can demonstrate that it executed these transactions solely on behalf of its clients (which it has not done). *See Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 8 (N.Y. 2016) ("Repeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer … demonstrates volitional activity constituting [purposeful availment]."); *Licci IV*, 732 F.3d at 171 (exercising jurisdiction based on a defendant's intentional use of a U.S.-based correspondent account on behalf of a client). An agent avails itself of a particular country's banking system when it chooses "where to receive the funds to make [the transactions]" on behalf of its principal—conduct "properly attributable to the [agent]." *Arcapita I*, 549 B.R. at 70 n.17. Nowhere in its Motion does HSSL suggest that its clients requested it to process payments relating to their investments in the Funds through a U.S. correspondent account. HSSL chose to receive redemption payments on behalf of its clients through its U.S. correspondent account and, therefore, is subject to jurisdiction as a result.

privilege of doing business in New York." 732 F.3d at 171 (emphasis added). Here, HSSL likewise used New York banks as instruments for accomplishing the wrong for which the Liquidators seek redress: the Liquidators seek to claw back from HSSL the very redemption payments that HSSL *obtained as an investor using New York banks* to ███████ redeem the shares. By contrast, the defendants in *Hill* and *Hau Yin To* were not investors in any feeder funds, and the plaintiffs were not seeking to claw back redemption payments received by the defendants.[27]

*Finally*, HSSL argues that the "[u]se of a correspondent account by a foreign bank to clear transfers for a foreign contract denominated in U.S. dollars does not, as a matter of law, confer jurisdiction over the foreign bank." Mot. 16. But the only case HSSL cites for that proposition aside from *Hill* and *Hau Yin To—Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010)—is inapposite. The defendant there was *not even alleged to have transferred any money* to the U.S. *Tamam* simply recognized that allegations that the defendant *maintained* U.S. accounts were not enough absent "allegations … [of] the actual transfer of money through New York." *Id.* The Liquidators have never argued that HSSL should be subject to the Court's jurisdiction simply because it *maintained* an unused U.S. correspondent account. Instead, HSSL is subject to the Court's personal jurisdiction because it *actively used* a U.S. correspondent account and ███████ ███████. As explained above, such use is sufficient to establish jurisdiction.

### 2.    HSSL Utilized U.S. Correspondent Accounts To Effectuate More Than █ Wire Transfers

HSSL *frequently* used U.S. correspondent accounts in transacting with Sentry. "[A] foreign

---

[27] Moreover, HSSL's core conduct targeted by the Liquidators' claims—investing in and receiving redemption payments from the Funds—was (at least with respect to Sentry) accomplished predominantly—if not entirely—through its correspondent accounts. That conduct cannot be fairly characterized as "incidental" to the Liquidators' claims seeking to recoup those same redemption payments. *See Incidental*, Black's Law Dictionary (11th ed. 2019) (defining "incidental" as a "minor role" in carrying out "something of greater importance").

bank's *repeated use* of a correspondent account in New York on behalf of a client … show[s] purposeful availment of New York's" banking, currency, and legal systems. *Licci IV*, 732 F.3d at 168 (emphasis added) (quoting *Licci III*, 984 N.E.2d at 900).

HSSL repeatedly utilized U.S. correspondent accounts at three points in the process of investing in and receiving redemption payments from Sentry. *First*, ████████████████ ████████████████████████████████████████████████████████ ████████████. *E.g.*, Ex. 5 at -434 (████████████████). *Second*, ████ ████████████████████████████████████████████. *E.g., id. Finally*, HSSL directed Sentry to send redemption payments to a U.S. correspondent account ██████. HSSL received at least 10 redemption payments from Sentry totaling $80,569,316.20 over four-and-a-half-years ████████████████. Compl. Ex. A; Ex. 35 (████████████). In total, HSSL processed at least ██ transactions, amounting to ████ million, through various U.S. accounts, ████████████████.

With respect to both the volume of transfers and the total sum of money involved, HSSL's correspondent account use dwarfs what courts have found sufficient in other cases. In *Licci IV*, the court exercised personal jurisdiction based on "dozens" of wire transfers "total[ing] several million dollars." 732 F.3d at 170-71. In *Averbach v. Cairo Amman Bank*, the court concluded that 23 fund transfers through correspondent banks over the course of two years were sufficient. 2020 WL 486860, at *5 (S.D.N.Y. Jan. 21, 2020), *R. & R. adopted* 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020). And still other cases have held that as few as one or two transfers can suffice. *See Schansman v. Sberbank of Russia PJSC*, 2021 WL 4482172, at *5 (S.D.N.Y. Sept. 30, 2021) (two transfers for a combined $300 where the plaintiff alleged more generally that "some of" the millions of dollars had been routed through U.S. accounts); *Arcapita I*, 549 B.R. at 56, 70 & n.18

(holding that even a single use of a third party's correspondent account use was sufficient). *A fortiori*, HSSL's use of U.S. accounts to process at least ▉ wire transfers involving over ▉ million and spanning ten years is "recurring" and sufficient to confer personal jurisdiction over HSSL.

HSSL is also wrong that exercising personal jurisdiction here would open the floodgate of "any foreign commercial dispute" being haled into New York courts. Mot. 17. HSSL is not akin to a defendant that had a USD transaction pass through an account located in New York, unbeknownst to itself. *Id.* It affirmatively chose to invest in Sentry and deliberately used U.S. accounts, again and again, to ▉▉▉▉▉▉ receive redemption payments in order to obtain the benefits of the U.S. securities market. No expansion of the Second Circuit's personal jurisdiction doctrine is necessary to hold that HSSL falls firmly within this Court's jurisdiction with respect to its Sentry redemptions.[28] *See, e.g.*, *Licci IV*, 732 F.3d at 171.

### 3.    HSSL's Correspondent Account Use Was Sufficiently Related To The Harms Alleged

HSSL's use of U.S. accounts is sufficiently related to the Liquidators' claims seeking to recover Sentry redemption payments. Where a defendant's use of a U.S. account is "*an instrument for accomplishing the alleged wrongs* for which the plaintiff seeks redress," it is sufficiently related

---

[28] HSSL's reliance on *Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 12 N.E.3d 456, 459-60 (N.Y. 2014), and *Universal Trading & Inv. Co., Inc. v. Tymoshenko*, 2012 WL 6186471, at *3 (S.D.N.Y. Dec. 12, 2012), Mot. 17, is misplaced. *Mashreqbank* simply clarified that the passage of funds through New York banks did not itself preclude dismissal on a *forum non conveniens* ground. 12 N.E.3d at 450-60. There was no discussion of the significance of such a transaction in a minimum contacts inquiry. And in *Universal Trading*, a foreign defendant requested a wire transfer from her account at a bank in Ukraine to the recipient's account in Antigua. 2012 WL 6186471, at *3. The Ukrainian bank, unbeknownst to the defendant, processed this transfer through several correspondent accounts, including one in New York, which the court found was insufficient for the exercise of personal jurisdiction without more. *Id.* But unlike in *Universal Trading*, HSSL's account use directly resulted from its own deliberate conduct.

to the claims at issue. *Licci IV*, 732 F.3d at 171; *see also FGG*, 627 B.R. at 566 (noting that the "arises out of" prong "may be satisfied when defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum" (quoting *U.S. Bank Nat'l Ass'n*, 916 F.3d at 151)).

As discussed above, a core element of the Liquidators' claims is that HSSL received inflated redemption payments. And, as also discussed above, HSSL accomplished the wrongs for which the Liquidators seek redress using the New York banking system to ███████ obtain the redemption payments for those shares that the Liquidators seek to claw back. *See supra* pp. 27-28. That is enough to establish jurisdiction over HSSL with respect to the redemption payments at issue. *See Licci IV*, 732 F.3d at 171; *BNP Paribas S.A.*, 594 B.R. at 191 (finding that claims for redemption payments the defendants received as investors in a BLMIS feeder fund arose from the defendant's wiring of U.S. dollars to New York and receipt of redemption payments from a New York correspondent account).

### C.    HSSL Engaged In Other Business Activity In And Directed At The United States

HSSL's additional U.S.-oriented business activity related to the Liquidators' claims also supports exercise of jurisdiction here. Business contacts have long been considered a basis for the exercise of jurisdiction over a foreign defendant where that conduct is sufficiently related to the claims at issue. *See, e.g.*, *Burger King Corp.*, 471 U.S. at 475-76 (collecting cases). That is true even where the defendant conducted most or even all of this business while overseas, *see In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 319 (S.D.N.Y. 2020) (explaining that conduct that "occurs entirely out-of-forum" may support jurisdiction "if the defendant expressly aimed its conduct at the forum" (quoting *Licci IV*, 732 F.3d at 173)), and even where the conduct is carried out by the defendant's agent, *see In re Eur. Gov't Bonds Antitrust Litig.*, 2020 WL

31

4273811, at *6 (S.D.N.Y. July 23, 2020). HSSL has at least two categories of such contacts relevant here.

*First*, the long-form subscription agreements HSSL signed included provisions designating New York as the venue for dispute resolution. Ex. 3 at -655, -657 ¶¶ 16, 19; Ex. 4 at -209 ¶¶ 17, 20; *see also* Compl. ¶ 23. Judge Bernstein previously held that those provisions, standing alone, did not amount to consent to personal jurisdiction in this action. *Fairfield I*, 2018 WL 3756343, at *11.[29] But they nonetheless support the exercise of jurisdiction when taken in concert with HSSL's correspondent account use and other forum-directed conduct. To argue otherwise is to ignore that even when not dispositive, "[a] choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004); *see also In re Motors Liquidation Co.*, 565 B.R. 275, 288-89 (Bankr. S.D.N.Y. 2017) (holding that forum selection and choice of law clauses "support[ed] finding personal jurisdiction"); *BLI*, 480 B.R. at 516, 517 n.15 (same).

*Second*, HSSL engaged in extensive diligence within and aimed at the U.S. in connection with its decision to subscribe to the Funds, including seven meetings—direct and indirect—in New York. High-ranking HSSL employees visited Madoff's office in New York in 2002 and 2004. Exs. 10-11, 18-19; *see also* Ex. 8 at 2, 95:10-16; Ex. 13 at -719. ███████████████████████ ███████████. Exs. 36, 40. ██████████████████████ ███████████████████████████████████ ███████████████████████████████████████████. Ex. 20

---

[29] The Liquidators are appealing that decision to the Second Circuit.

at -591; *see also* Ex. 47.[30] ████████████████████████████████████

████████████████. Exs. 48-50. ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████. *See* Exs. 45, 48, 51-52.

Once HSBC Bank engaged KPMG to audit BLMIS, ██████████████████████

████████████████. Ex. 22 at -129. ██████████████████████████████

████████████████████████████████████. Exs. 14-15, 53. ████████████

████████████████████████████████████████████████████████████████

████. Exs. 54-56; *see also* Ex. 26. In 2008, consistent with its historical practice, HSSL again used

employees of its affiliates within the larger HSBC corporate family as proxies to communicate

with Madoff in New York. For example, ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████. Ex. 57 at -519; Ex. 58 at -584. ████████████

████████████████████████████████████████████████████████████████

████████████████████. Ex. 59; *see also* Ex. 60 (████████████████████

████████████). ██████████████████████████████████████████████

████████████████████████████████████. Ex. 61 at -649. Simply put, HSSL

was constantly interacting with Madoff in New York through its affiliates, and HSSL cannot

dissociate itself from those in-forum activities of affiliates after having utilized them for its benefit.

Those contacts, particularly when considered alongside HSSL's intentional investment in

Madoff feeder funds and purposeful use of U.S. accounts (discussed in Sections I.A and I.B,

---

[30] ████████████████████████████████████████████████████████████

██████████████████ *Compare* Ex. 20 at -591, *with* Ex. 49 at HSSL-FF-00000992.

*supra*), support this Court's exercise of jurisdiction over HSSL. And each of these contacts plainly relates to the Liquidators' claims. The forum-selection and choice-of-law clauses were contained in the subscription agreements that gave rise to the redemption payments at issue here. And HSSL's due diligence-related activity contributed to its knowledge that the NAVs were inaccurate—a core element of the Liquidators' constructive trust claims. *Fairfield II*, 596 B.R. at 301. That is more than sufficient to conclude that the above contacts relate to the Liquidators' claims and therefore support the exercise of jurisdiction. *See Cathay Life Ins.*, 2022 WL 16626325, at *4; *Ford Motor Co.*, 141 S. Ct. at 1025.

### D.    The Court May Exercise Jurisdiction Over HSSL Even If The Transfers Are Deemed Foreign For Purposes Of The Bankruptcy Safe Harbor Analysis

HSSL attempts to make much ado about nothing by insisting that the Liquidators have previously conceded "[t]he redemption transfers at issue here were purely foreign" and that "every *relevant* component of the transactions at issue here occurred outside the [U.S.]" Mot. 2 (emphasis added) (quoting Pls.'-Appellants' Opening Br. for Second-Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911, Dkt. 440 (S.D.N.Y. July 21, 2021) ("Pls.' Opening Br.")); *see also id.* at 10 ("There is no dispute that every element of the transaction is 'purely foreign.'" (quoting Pls.' Opening Br. at 24)). HSSL is quoting the Liquidators' appellate brief out of context and ignoring black-letter law holding that "[t]he tests for personal jurisdiction and extraterritoriality are not the same." *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017); *see also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) (distinguishing between the personal jurisdiction inquiry and the determination of whether a transaction is domestic or foreign).

For this reason, the set of facts relevant to the personal jurisdiction inquiry is different from the set of facts relevant to the extraterritoriality inquiry. *Compare RJR Nabisco, Inc. v. European*

34

*Cmty.*, 579 U.S. 325, 337 (2016) (explaining that the extraterritoriality inquiry focuses on "conduct relevant to the statute's focus"), *with Licci IV*, 732 F.3d at 170 (holding that the specific personal jurisdiction inquiry focuses on the "totality" of the defendant's forum contact that give rise or relate to the plaintiff's claim). In this action, "the focus [of the *extraterritoriality*] analysis is the location of the transfer" itself. *Picard v. Bureau of Labor Insurance*, 2016 WL 6900689, at *19 (Bankr. S.D.N.Y. Nov. 22, 2016), *vacated on other grounds and remanded sub nom. In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Secs. LLC*, 917 F.3d 85. By contrast, the personal jurisdiction inquiry addresses a much broader set of facts, *see supra* Sections I.A.-I.C., including, as relevant here, the defendant's knowledge and intent in making the investment that gave rise to the transfers at issue, *see BLI*, 480 B.R. at 517, the defendant's communications with individuals in the forum in connection with that investment, *see Cathay Life Ins.*, 2022 WL 16626325, at *3, forum selection clauses in the contracts governing that investment, *see Sunward Elecs.*, 362 F.3d at 23, and the defendant's deliberate and frequent use of U.S. accounts to facilitate █████████ █ the redemption transfers at issue, *see Licci IV*, 732 F.3d at 168-71.[31]

The Liquidators referred to the redemption transfers as "purely foreign," Pls.' Opening Br. at 24, because under applicable law the only "*relevant component[s]*" of the redemption transfers for purposes of the extraterritoriality analysis were in fact foreign, *see* Pls.' Opp'n Br. at 66-68,

---

[31] One contact—the redemption transfers from Sentry—is relevant to both inquiries given HSSL's deliberate use of U.S. accounts to receive those transfers. The Liquidators' prior extraterritoriality argument that those transfers are "foreign" was premised on well-settled law holding that use of a U.S. correspondent account does not render otherwise foreign transfers domestic for extraterritoriality purposes. *See* Pls' Opp'n Br. at 68-70, *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*, 10-ap-03496, Dkt. 1336 (citing *Bureau of Labor Insurance*, 2016 WL 6900689, at *20); s*ee also In re Madoff Secs.*, 513 B.R. 222, 228 n.1 (S.D.N.Y. 2014) (holding that, for *extraterritoriality* purposes, the use of U.S. accounts to process foreign U.S. dollar transfers did not render the transfers domestic); *Loginovskaya v. Batrachenko*, 764 F.3d 266, 268-69 (2d Cir. 2014) (same). That is not so for personal jurisdiction. *See, e.g.*, *Licci IV*, 732 F.3d at 168-71.

not because it "served their purposes." Mot. 2. The Liquidators' characterization of the transfers as foreign for purposes of extraterritoriality has no bearing on this motion.[32]

## II.    The Exercise Of Jurisdiction Over HSSL Is Reasonable

Exercising specific jurisdiction over HSSL—which deliberately chose to invest in and profit from the U.S. securities market and repeatedly used the U.S. banking system to do so—is "reasonable under the circumstances" presented here. *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Bristol-Myers Squibb*, 137 S. Ct. at 1786). Because the Liquidators have made "a threshold showing of minimum contacts," the burden is on HSSL to "present[] 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Metro. Life Ins.*, 84 F.3d at 568 (quoting *Burger King*, 471 U.S. at 477). HSSL has not done so.

To assess reasonableness, courts consider: "(1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the 'interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and (5) 'the shared interests of the several States in furthering fundamental substantive social policies.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 151 n.5 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987)). "[T]he primary concern is the burden on the defendant." *Id.* (cleaned up) (quoting *Bristol-Myers Squibb*, 137 S. Ct. at 1780). "Dismissals resulting from the application of the reasonableness test should be few and far between." *Cunningham v. Gen. Motors LLC*, 2021 WL 827124, at *2 (S.D.N.Y. Mar. 4, 2021) (cleaned up) (quoting *Metro. Life Ins. Co.*, 84 F.3d at 575). These factors strongly support the exercise of jurisdiction in this case.

---

[32] For years, the Liquidators have consistently made these extraterritoriality and personal jurisdiction arguments in tandem, pointing out that transfers that are "foreign" for purposes of extraterritoriality may still support personal jurisdiction. *See* Pls.' Opp'n Br. at 68 (discussing the significance of correspondent account use for each inquiry); *id.* at 69 (distinguishing conduct relevant for extraterritoriality from that relevant for personal jurisdiction).

36

In an effort to characterize the exercise of jurisdiction as unreasonable, HSSL argues that: (1) the United States' interest in this dispute is "minimal at best"; (2) HSSL would face "substantial burdens" litigating here because discovery "would potentially expose" it to "civil and criminal liability"; and (3) the Liquidators have not demonstrated that it is "more reasonable" to litigate here than elsewhere. Mot. 21-23. These arguments are meritless.

*First*, contrary to HSSL's assertion, the United States clearly has a substantial interest in this action. Courts have recognized that the U.S. has a strong interest in ensuring that its financial system is not used for unlawful purposes. *See, e.g.*, *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 31 (E.D.N.Y. 2016) ("[T]he Court also may take into account 'the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used' [for unlawful purposes]." (quoting *Licci IV*, 732 F.3d at 174)). At its core, the case is about HSSL's decision to indirectly invest in and reap profits from BLMIS and the U.S. securities market through Madoff feeder funds. Allowing foreign investors like HSSL to evade U.S. jurisdiction in these circumstances, simply because they chose to invest through a foreign-based conduit as part of their scheme, would ignore the reality of the transactions, allowing those investors to reap all the benefits of the U.S. securities market without any of the corresponding obligations. That result would be all the more perverse where, as here, HSSL deliberately and repeatedly used U.S. correspondent bank accounts to accomplish its investment goals. *See supra* Section I.B.

HSSL argues that the United States' interests are minimal because subject matter jurisdiction would not exist over the Liquidators' "non-core" claim but for the Chapter 15 recognition of the Liquidators' foreign liquidation proceedings. Mot. 21. That counterfactual argument is a red herring. This Court has already found that it has subject matter jurisdiction and should find now that the United States has an interest in this dispute.

*Second*, HSSL has no legally cognizable burden here. As in *Lombard Odier*, "Defendant has actively participated in this Court's litigation for over ten years. It is represented by U.S. counsel and 'irrevocably' submitted to the jurisdiction of New York courts[] when it signed its subscription agreements with the Fairfield Funds." 2022 WL 2387523, at \*5. In *Lombard Odier*, this Court held that, as here, the forum selection clauses in the subscription agreements "could not be used as the sole basis for this Court's exercise of jurisdiction." *Id.* at n.2. Still, "the fact that Defendant agreed to submit to the jurisdiction of this Court is certainly a relevant factor in determining whether the exercise of jurisdiction over Defendant is reasonable." *Id.*

HSSL argues that engaging in document discovery about redemption payments in the United States "would *potentially* expose" it "to civil and criminal liability" under foreign law. Mot. 22 (emphasis added). But the parties have successfully negotiated a redaction protocol that allows HSSL to comply with its obligations under the Federal Rules without violating foreign law. Critically, HSSL has already substantially completed its production of documents for purposes of jurisdictional discovery, directly contradicting its argument.

Even if HSSL had legitimate discovery concerns, they have no place "in the context of assessing the reasonableness of an exercise of personal jurisdiction." *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 333 (S.D.N.Y. 2018) (cleaned up), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018); *see Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 99 (S.D.N.Y. 2015) (noting "no other courts" considered this type of foreign law argument, and "declin[ing] to be the first").[33] HSSL does not cite any case in which a court declined to exercise personal jurisdiction because some aspect of

---

[33] Perhaps in recognition that modern technology and travel ease any additional burden HSSL might face due to its status as a foreign defendant, HSSL's discovery argument is its sole burden argument. *See, e.g.*, *Licci*, 732 F.3d at 174 ("[T]he conveniences of modern communication and transportation ease any burden … impose[d] on [the defendant]." (cleaned up)).

discovery theoretically "could implicate," not even necessarily violate, foreign laws, at some future indeterminate point.

*Third*, HSSL's assertion that the Liquidators "have not demonstrated that it is *more* reasonable for them to litigate their claims against HSSL in New York rather than in the BVI … or in Luxembourg," Mot. 22 (emphasis added), is flatly inconsistent with personal jurisdiction law. HSSL does not provide any legal support for the proposition that the existence of an alternate forum has any bearing on personal jurisdiction or renders the exercise of jurisdiction in the United States unreasonable.[34] A different jurisdiction's concurrent ability to hear claims has no bearing on whether it is *un*reasonable for a U.S. court to likewise do so. In addition, this Court hears other cases about the very same Ponzi scheme. *See, e.g.*, *Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC v. Alpha Prime Fund Limited et al.*, No. 09-ap-01364 (Bankr. S.D.N.Y.). It is reasonable for this case, involving the same scheme and same Defendant, to be litigated in the same Court.

*Finally*, HSSL's characterization of the Liquidators' selection of this forum as "maneuvering," Mot. 23, is baseless. It is contradicted by the chronology of this case: over 200 suits were pending in this Court before any substantive decision was issued by any BVI court, and it was the BVI action *defendants* that pushed the BVI litigation into the preliminary issues process and thereafter cited that process as support for a stay of the U.S. litigation (over the Liquidators' objections). *See Fairfield Sentry Ltd. (In Liquidation) v. Theodoor GGC Amsterdam*, No. 10-ap-

---

[34] HSSL's argument sounds vaguely like a *forum non conveniens* argument, but it did not move to dismiss on those grounds. Even if such a motion were before the Court (it is not), the Court would "begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden" of demonstrating otherwise. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001). "The plaintiff's choice of forum should rarely be disturbed" "[u]nless the balance is strongly in favor of the defendant," *Id.* at 70 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)), which it is not here.

03496 (Bankr. S.D.N.Y), Dkt. 925 (Hare Decl. dated Oct. 21, 2016); *id.* Dkt. 1407 (Molton Decl. dated April 6, 2017); *id.* Dkt. 1406 (Liquidators' Br. dated April 6, 2017) at 17-19.

Moreover, HSSL cites dicta from a single case, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1031 (2021), in which the Supreme Court distinguished its ruling in another personal jurisdiction case, *Bristol-Myers Squibb*, 137 S. Ct. 1773, where the plaintiffs had engaged in forum shopping. In *Ford*, the Supreme Court upheld the exercise of personal jurisdiction on the ground that "the connection between plaintiffs' claims and [defendant's] activities" in the forum states was "close enough." *Id.* at 1032. In *Bristol-Myers Squibb*, the Supreme Court found a lack of personal jurisdiction when non-California plaintiffs sued Bristol-Myers in California over a drug that Bristol-Myers sold nationwide. 137 S. Ct. at 1778-79. In *Ford*, the Court explained that the *Bristol-Myers* result turned on the complete lack of *plaintiffs'* contacts with California: they had neither purchased nor ingested the drug in California, nor had they been injured there. 141 S. Ct. at 1031-32. Here, HSSL's intent to invest in BLMIS via the Funds, its correspondent account use, and its additional contacts with the United States are closely connected to the Liquidators' claims, as explained above. *Ford* therefore supports the exercise of jurisdiction here, and *Bristol-Myers Squibb* is wholly inapplicable.

HSSL has failed to establish that the exercise of jurisdiction is unreasonable.[35]

## **CONCLUSION**

For the reasons discussed above, this Court should deny HSSL's motion.

---

[35] HSSL cites out-of-circuit cases for the proposition that defendants should be dismissed where their contacts "only barely satisfy the minimum contacts standard" and "a majority of the reasonableness factors weigh against the exercise of jurisdiction." Mot. 23-24 (cleaned up). But cases in which the reasonableness analysis warrants dismissal despite sufficient minimum contacts are "few and far between." *Cunningham*, 2021 WL 827124, at *2. In any event, the minimum contacts standard is squarely satisfied and HSSL has not shown that a majority of the reasonableness factors weigh in its favor, rendering its cited authority inapplicable.

40

Date: December 15, 2022

Respectfully submitted,

SELENDY GAY ELSBERG PLLC

/s/  David Elsberg
David Elsberg
Maria Ginzburg
Jordan Goldstein
Lena Konanova
David S. Flugman
Joshua S. Margolin
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
delsberg@selendygay.com
mginzburg@selendygay.com
jgoldstein@selendygay.com
lkonanova@selendygay.com
dflugman@selendygay.com
jmargolin@selendygay.com

-and-

BROWN RUDNICK LLP
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800
dmolton@brownrudnick.com
mkrzyzowski@brownrudnick.com

*Attorneys for the Plaintiffs Joint Liquidators*