**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOR PUBLICATION

| | |
|---|---|
| In re:<br><br>Fairfield Sentry Limited, et al.<br><br>　　　　　　　Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 10-13164 (JPM)<br><br>(Jointly Administered) |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al.,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>HSBC SECURITIES SERVICES (LUXEMBOURG) S.A., et al.,<br><br>　　　　　　Defendants. | Adv. Pro. No. 10-03630 (JPM) |

**MEMORANDUM OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO DISMISS**

*APPEARANCES:*

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
*Counsel for Defendant HSBC Securities Services (Luxembourg) S.A.*
One Liberty Plaza
New York, NY 10006
By:　　Jeffrey A. Rosenthal
　　　　Joseph M. Kay
　　　　David Z. Schwartz
　　　　JD Colavecchio
　　　　Thomas Q. Lynch

2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
By:　　Nowell D. Bamberger

**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs Joint Liquidators*
Seven Times Square
New York, NY 10036
By:　　Jeffrey L. Jonas
　　　　David J. Molton
　　　　Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    <u>INTRODUCTION</u>

Pending before the Court is the motion of the Defendant, HSBC Securities Services

(Luxembourg) S.A., ("HSBC Lux" or "Defendant") to dismiss the Fourth Amended Complaint

(the "Amended Complaint") for lack of personal jurisdiction.  Mot. to Dismiss, ECF[1] No. 205.

The Court held a hearing on the Motion to Dismiss on October 25, 2023 (the "Hearing").  For the

reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.    <u>JURISDICTION</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and

the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court

previously concluded that it has subject matter jurisdiction over this and related actions.  *See In*

*re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip.

Order, ECF No. 98.  Personal jurisdiction is contested by the Defendant and will be discussed

below.

## III.    <u>BACKGROUND</u>

This adversary proceeding was filed on September 21, 2010.  (Compl., ECF No. 1).

Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly

appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation)

("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma" and, together with Sentry, the

"Fairfield Funds") filed the Amended Complaint on August 11, 2021.  *See* Am. Compl., ECF

No. 167.  Via the Amended Complaint, the Liquidators seek the imposition of a constructive

---

[1]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03630-jpm unless
otherwise noted.

trust and recovery of over $84 million[2] in redemption payments made to HSBC Lux by Sentry and Sigma. *Id.* ¶¶ 1, 9, 49, 191.

### A. **The BLMIS Ponzi Scheme**

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[3] *Id.* ¶ 1. Defendant allegedly invested into several funds, including Sentry and Sigma, that channeled investments into BLMIS. *Id.* ¶¶ 2, 5.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue. *Id.* ¶¶ 5; 42–43; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund—what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money."). Fairfield Sigma, in contrast, was an indirect feeder fund, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currency. Am. Compl. ¶¶ 42–43. BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 7–8. Without new

---

[2]    The Amended Complaint alleges that Defendant received "$84,497,835.97 from Sentry and Sigma in respect of shares tendered for redemption." Am. Compl. ¶ 49. The Plaintiffs have, since the filing of the Amended Complaint, abandoned asserting "a claim on the September 27, 2005 redemption of 621.47 Sentry shares for $100,000." Opp'n at 11 n.17, ECF No. 260. Of the $84,397,8353.97 remaining total, the Plaintiffs allege that Defendant "received $80,569,316.23 from Sentry and approximately €2,824,225.24 from Sigma through the redemption payments at issue . . . . [T]he Liquidators have applied the exchange rate as of the date of each redemption payment out of Sigma and calculated the dollar value of the Sigma redemptions to be approximately $3,828,519.74. This number may vary if the Court ultimately determines that a different exchange rate applies." Opp'n at 1 n. 2, ECF No. 260.

[3]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff. Details of that scheme have been recounted by many courts. *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart.  *Id.* ¶¶ 8, 13–15, 43, 46–48.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV").  *Id.* ¶ 8.  Defendant is allegedly "one such investor."  *Id.*  To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry."  *Id.* ¶ 45.  In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred.  *Id.* ¶ 46.  The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses."  *Id.*  The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares.  *Id.* ¶ 48.  The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments.  *Id.*

Defendant HSBC Lux is a corporate entity organized under the laws of Luxembourg with a registered address in Luxembourg.  *Id.* ¶ 33.  HSBC Lux subscribed for the purchase of shares with Sentry and Sigma, eventually receiving approximately $84,497,835.97 in redemption payments from the Funds between April 8, 2004, and September 16, 2008.  *Id.* ¶¶ 33, 49.  At Defendant's "directions and instructions, some or all of the Redemption Payments were received at . . . designated United States-based bank accounts."  *Id.* ¶ 46.[4]

Bernard Madoff was arrested in violation of federal securities laws on December 11, 2008.  *Id.* ¶ 168.  The United States Attorney brought criminal charges against him, alleging that

---

[4]      Exhibits to the Amended Complaint show the dates and amounts of each redemption payment received by Defendant from Sentry and from Sigma.  *Id.* Exs. A, B.

Madoff ran a Ponzi scheme.  *Id.*  On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 169.  In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations.  *Id.* ¶¶ 170–71. Madoff was sentenced to 150 years in federal prison and died in April 2021.  *Id.* ¶ 172.

The Amended Complaint alleges that HSBC Lux "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made.  *Id.* ¶ 184.  The Amended Complaint further asserts that between 2001 and 2008, Defendant recognized the improbability of the returns from BLMIS, and employees of the Defendant "continued to identify multiple additional indicia of BLMIS-associated fraud."  *Id.* ¶ 185.  These indicia included Madoff's failure to segregate accounts and the lack of a reliable independent auditor.  *Id.*  In the face of red flags such as these, Defendant purportedly "continuously and deliberately failed to take steps to assuage the concerns associated with BLMIS."  *Id.*

**B.  <u>The Prior Litigation and Procedural History</u>**

The Fairfield Funds were put into liquidation in the British Virgin Islands ("BVI") in 2009.  *Id.* ¶¶ 26–28.  The BVI issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds.  *Id.* ¶ 28.  Pursuant to the appointment order of the BVI court,[5] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 178.  The Liquidators initiated proceedings in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme.  Mem. L. at 6,

---

[5]     The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice."  *See* Am. Compl. at 1.

ECF No. 206; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475

(S.D.N.Y. 2022); *see also In re Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re*

*Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("Fairfield II").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the

Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings.  *Id.*

¶ 29.  This Court granted that recognition on July 22, 2010.  *Id.*  All cases filed by the Plaintiffs

were administratively consolidated before this Court in November 2010.  *See* Consolidation

Order, Adv. Pro. No. 10-03496, ECF No. 25; *see also* Letter from HSBC Lux Counsel

Regarding Procedural History ("Letter Regarding Procedural History") at 3, ECF No. 321.

The Plaintiffs asserted multiple causes of action in those consolidated adversary

proceedings including, *inter alia*, mistaken payment and constructive trust.[6]  Compl. ¶¶ 61–84,

ECF No. 6;  *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the U.S.

proceedings pending resolution of the BVI proceedings.  *See* Am. Order Staying Redeemer

Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343,

at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for

restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014]

UKPC 9 ("*Migani* ").[7]  The Privy Council held that the Plaintiffs' claims for restitution in the

BVI to recover redemption payments arising out of transactions governed by the Funds' Articles

of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption

---

[6]      Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's
Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the
implied covenant of good faith and fair dealing.

[7]      *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without
numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL
1219748.

payments thus depended on whether it was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption." *Id.* ¶ 19. The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption. *Id.* ¶ 21. The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken. *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates. *See In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018). Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at *6. The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called 'Knowledge Defendants' to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). In December

2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463. The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 146; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. Order Granting Mot. to Amend, ECF No. 166; Order Lifting Stay of Redeemer Actions, ECF No. 165.

### C. The Pending Motion

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds. Am. Compl. ¶ 191, ECF No. 167. The Amended Complaint alleges that HSBC Lux had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated. *Id.* ¶ 184. "By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma." *Id.* ¶ 188.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* ¶ 181 (citing 596 B.R. at 293). As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that HSBC Lux purposefully availed itself of the laws of the United States and the State of New York by "investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and, upon information and belief, maintaining bank accounts in the United States, and in fact receiving Redemption Payments in those United States-based accounts." Am. Compl. ¶ 20, ECF No. 167. The Amended Complaint further alleges that Defendant "selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those accounts." *Id.*

The parties engaged in personal jurisdiction discovery between September 2021 and June 2023. *See* Letter Regarding Procedural History at 7, ECF No. 321. Over 35,000 documents have been produced in discovery by HSBC Lux in this proceeding and by HSBC Private Bank (Suisse) S.A. in adversary proceeding no. 10-03633. *Id.* Fact discovery is ongoing in this case. *Id.* at 2; *see also* Second Am. Scheduling Order, ECF No. 245.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 3–5, ECF No. 206.

The Liquidators filed an opposition to the Motion and submitted declarations of Lena Konanova and Sara Joyce in support of their opposition. Opp'n, ECF No. 260; Declaration of

Lena Konanova in Support of Liquidators' Opposition ("Konanova Decl."), ECF No. 261;

Declaration of Sara K. Joyce ("Joyce Decl."), ECF No. 262. The Liquidators argue that

exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with

the United States in knowingly and intentionally investing in the Fairfield Funds, using U.S.

correspondent accounts to invest in and receive payments from Sentry, and other business

activities support personal jurisdiction.  Opp'n at 2–4, ECF No. 260.

　　　　HSBC Lux filed a reply memorandum and supporting declarations on March 15, 2023.

Reply, ECF No. 274; Decls., ECF Nos. 275–81.  On June 30, 2023, the Liquidators filed a sur-

reply, as authorized by this Court, and two supporting declarations.  Am. Scheduling Order, ECF

No. 302; Sur-Reply, ECF No. 313; Supplemental Declaration of Sara K. Joyce ("Suppl. Joyce.

Decl."), ECF No. 314; Declaration of David J. Molton in Support of Liquidators' Sur-Reply

("Molton Decl."), ECF No. 315.[8]  The Defendant also filed a letter to this Court on October 11,

2023, in which it argued for the application of the recently-issued decision of the District Court

in *Pub. Inst. for Soc. Sec. v. Picard (In re BLMIS)*, No. 22-cv-8741-GHW, 2023 WL 6143985

(S.D.N.Y. Sept. 20, 2023).  Letter from HSBC Lux Counsel Regarding *PIFSS* ("HSBC Lux

Letter Regarding *PIFSS*"), ECF No. 330.  The Liquidators filed a responsive letter shortly

thereafter.  Letter from Plaintiffs Regarding *PIFSS* in Response ("Pls.' Response Letter"), ECF

No. 331.  This Court reviewed the above filings and held a hearing on the Motion on October 25,

2023.  *See* Hr'g Tr., ECF No. 335.

---

[8]　　　　Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal.  The Court held a status conference on December 18, 2023, in which the Court informed the parties that certain documents previously filed under seal might be cited, quoted, or otherwise referenced by the Court in this opinion.  *See* Notice of Hr'g, ECF No. 345.  The Court gave the parties the opportunity to withdraw from the record any previously sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the opinion.  No party requested withdrawal of any documents.

## IV.    **DISCUSSION**

### A. **The Law of Personal Jurisdiction**

In order to subject a defendant to personal jurisdiction in the United States, due process requires that the defendant have sufficient minimum contacts with the forum in which the defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state." *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)). "When jurisdiction is satisfied through Bankruptcy Rule 7004,[9] a bankruptcy court need not address its state's long-arm statute." *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124 F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted). There are three conditions necessary for the Court to exercise specific jurisdiction[10] over the non-resident defendant:

---

[9]     "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d). A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

[10]     Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. -----, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear*

First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiff "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball*, 902 F.2d at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now

---

*Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Mem. L. at 9, ECF No. 206 ("Plaintiffs do not allege that the Court has general jurisdiction over [Defendant], a Luxembourg financial institution that is not 'at home' in the United States, and so Plaintiffs must plead facts supporting the exercise of specific jurisdiction over [Defendant]."); Opp'n at 2 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy." 2023
WL 5016884, at *6 (citing 722 F.3d at 85). "Plaintiffs need only show that their prima facie
showing of jurisdiction is factually supported." *Id.* at *6. When considering a motion to dismiss
before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings
and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual
disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

### B. **Analysis of Purposeful Availment**

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the
defendant purposefully availed itself of the privilege of doing business in the forum and could
foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68,
82 (2d Cir. 2018) (quoting *Licci, v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir.
2013)). For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show
some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and
the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the
forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*,
835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with the forum state
may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,]
a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for
jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134)
(alteration in original). "It is insufficient to rely on a defendant's random, fortuitous, or
attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific
jurisdiction." *Id.*

Defendant asserts that the "Plaintiffs have elsewhere affirmatively argued" before the District Court that these claims are "purely foreign" and that "every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States." Mem. L. at 2, ECF No 206; *see also* Pls.-Appellants' Opening Br. for Second Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[11] safe harbor. *See* Opening Brief at 24. (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic

---

[11]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

### 1. Defendant's Use of Correspondent Accounts

The Plaintiffs point to the Defendant's choice to use correspondent accounts at Citibank and HSBC Bank USA, N.A. ("HBUS") as sufficient to establish minimum contacts with the United States. Opp'n at 24, ECF No. 260. "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996)). Plaintiffs allege that Defendant deliberately selected and used these U.S. correspondent accounts multiple times to effectuate the subscription and redemption payments that form the harms for which Plaintiffs seek redress.[12] Opp'n at 30, ECF No. 260.

Defendant argues that its alleged receipt of payments at a U.S.-based correspondent bank account is insufficient to establish personal jurisdiction and that "mere use of a correspondent

---

[12] The use of correspondent accounts concerns only the transfers that originated from Sentry. Opp'n at 23, ECF No. 260 ("Roughly 95 percent of the redemptions at issue in this case were from Sentry."). The investments in Sigma were in Euros, not U.S. dollars, and therefore did not require the use of U.S. correspondent accounts. Am. Compl. ¶ 42; *see also* Mem. L. at 4 n.2, ECF No. 206 ("Sigma investments were denominated in Euros, not U.S. dollars . . . . Plaintiffs do not assert jurisdiction with respect to redemptions from Sigma based on the use of correspondent accounts."); *see also* Opp'n at 24 n.25 ("While [Defendant HSBC Lux] did not designate a U.S. correspondent account for its redemption of Sigma shares, it is still subject to jurisdiction with respect to those transactions, as the Liquidators' jurisdictional theories . . . do not turn on correspondent account use").

account by a foreign bank to clear transfers for a foreign contract denominated in U.S. dollars does not, as a matter of law, confer jurisdiction over the foreign bank."  Mem. L. at 16, ECF No. 206 (citing *Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017)).

The cases that Defendant relies upon are distinguishable from the circumstances here. *Hau Yin To* found no basis for personal jurisdiction over a foreign defendant where the "wiring of funds through New York . . . was passive, rather than 'integral' to the alleged Ponzi scheme" and where the "passage of money through the U.S. bank accounts w[as] merely incidental and not specifically directed by any of the HSBC entities to facilitate the Ponzi scheme."  2017 WL 816136, at *7 n.6.  These facts were contrasted with those presented in *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, N.E.3d 1 (2016), where the New York Court of Appeals "held that the foreign bank was subject to personal jurisdiction in New York because the 'defendants [including the foreign bank] orchestrated the money laundering and that the New York account was integral to the scheme.'"  *Id.* (citing *Rushaid*, 28 N.Y.3d at 328) (alterations in original); *see also Vasquez v. H.K. & Shanghai Banking Corp. Ltd.*, 477 F. Supp. 3d 241, 253 (S.D.N.Y. 2020) (distinguishing between the "'unintended and unapproved use of a correspondent bank account, where the nondomiciliary bank is a passive and unilateral recipient' of money transfers, and the '[r]epeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer[.]'") (alteration in original) (quoting *Rushaid*, 28 N.Y.3d at 326–27).  Furthermore, in *Rushaid*, "there was a scheme in which the foreign bank specifically contemplated wiring tainted funds into a New York account from which corrupt payments were then further distributed to individuals with accounts at the foreign bank."  *To*, 2017 WL 816136, at *7 n.6.

Similarly, Defendant's reliance on *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010) is misplaced.  In *Tamam*, the District Court made clear that the complaint failed to provide "allegations that any money from any of these accounts was exchanged for U.S. dollars through a correspondent bank in New York." *Id.* at 727.  The District Court noted that the missing proposition, "i.e., the actual transfer of money through New York" was the "only factual predicate on which th[e] Court could potentially base its jurisdiction." *Id.*; *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 58 (2d Cir. 2012) (discussing the failure of plaintiffs in a case "factually similar" to *Tamam* to allege that the conduct giving rise to the cause of action was directly financed by funds transferred through New York).

Finally, with regard to *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339–40 (S.D.N.Y. 2016), the Court notes that the import of this case was already discussed by the District Court in *Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026 (S.D.N.Y. June 22, 2020).  The District Court explained in *Graham* that under *Hill*, a court evaluating whether a defendant purposefully availed itself of conducting activities in the forum must "look[] at the totality of the circumstances." *Id.* at *11.  "While [one] fact alone might not necessarily be sufficient, . . . upon consideration of the 'totality of the circumstances,'" the Court may nevertheless find that the Defendant purposefully availed itself of New York. *Id.* at *16 (quoting *Hill*, 207 F. Supp. 3d at 338).

Here, the Plaintiffs have shown that the Defendant was able to use a foreign-based or a U.S.-based correspondent bank account for its redemption requests and chose the latter. *See* Joyce Decl. at 6–9, ECF No. 262.; *id.* at 11 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* at 12 ("Neither the fact that Fairfield Sentry

was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").  The declaration of HSBC Lux's own expert states that the payments could have been made without selecting correspondent accounts in the United States. Expert Declaration of Vance S. Price ("Price Decl.") ¶ 12, ECF No. 280 ("While it is technically possible to clear a U.S. dollar payment transaction through a dollar clearing scheme outside the U.S. or through a single offshore foreign financial institution that has the capacity and capability to clear U.S. dollar transactions, for a bank with a U.S. presence to do so would be unusual in my experience."); *id.* ¶ 32 ("Offshore U.S. dollar clearing introduces credit risk exposure to those systems that rely on a commercial bank for settlement . . . . Clearing payments through the U.S. payments systems will eliminate the credit risk exposure because payments are final using central bank money.").

This was no passive endeavor; the Plaintiffs allege that Defendant "actively used U.S. correspondent account and Sentry's U.S. account" to transact with the Fairfield Funds.  Opp'n. at 28, ECF No. 260.  Defendant did so repeatedly, using the correspondent accounts to send 20 subscription payments totaling $30,887,828.05 for shares in Sentry to Sentry's own U.S. correspondent accounts.  *Id.* at 29.  Defendant further used its correspondent accounts to receive

at least 10 redemption payments from Sentry totaling over $80 million.  *Id.*  HSBC Lux accomplished the conduct at the heart of the Liquidators' claims through its use of the correspondent accounts.  The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations to support a finding of sufficient minimum contacts.  *Licci, v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

Defendant next argues that the knowing use of correspondent accounts is the "unilateral activity of another party" and thus not an appropriate consideration when determining whether defendant has sufficient contacts with the forum.  Mem. L. at 20, ECF No. 206 (quoting *Helicopteros*, 466 U.S. at 417).  As stated above however, the Liquidators have shown that Defendant actively selected its correspondent accounts as a means of moving funds through New York.  *See* Joyce Decl. at 8, ECF No. 260 (listing multiple "correspondent banks offer[ing] U.S. dollar correspondent accounts located outside of the U.S." during the relevant period). Defendant was free to designate an account of its choice, inside the United States or outside, to effectuate transfers and chose one based in the U.S. to process subscription payments and receive redemption payments.  *See id.* at 9–11 ("Factors Influencing Choice of Correspondent Account"); *id.* at 11 ("[T]he subscription agreements direct subscribers to wire the payments to the Fund's account at HSBC Bank, New York. The subscription agreements further direct the subscribers to identify the remitting bank for those redemption payments. The relevant clauses contain no requirement that the bank utilized for sending subscription payments be based in the U.S.").

Defendant argues that finding use of New York correspondent accounts as a basis for exercising specific jurisdiction over it would lead to disastrous results.  Hr'g Tr. at 55:3–11, ECF

No. 335.  Defendant claims that "every bank in the world that permits customers to transact in U.S. dollars, which is almost all of them, would be subject to personal jurisdiction in New York with respect to all of the underlying claims that involve U.S. dollar payments." *Id.* at 55:4–8; *see also* Reply at 16 (arguing that finding jurisdiction over Defendant here would "effectively establish general jurisdiction in the United States for any global transaction that is conducted in U.S. dollars, which Courts have emphatically rejected.").

HSBC Lux's concern for banks across the globe and for the capacity of the judicial system is unpersuasive.  The Second Circuit has stated that "[s]imply transacting in U.S. dollars does not make a defendant bank amenable to suit in New York."  *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 643 (2d Cir. 2023); *see also In re Lifetrade Litig.*, No. 17-CV-2987(JPO), 2021 WL 1178087, at *3 (S.D.N.Y. Mar. 29, 2021) (finding that by simply carrying out a transaction in New York "the connection [between the transaction and the claim] would not rise above the 'merely coincidental,' . . . as most large businesses move money through New York at one point or another.").  Furthermore, courts in this district have "routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction." *Tamam v. Fransabank* Sal, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010); *Licci*, 732 F.3d at 171 ("[W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy."); *see also Leema Enterprises, Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (describing the "mere maintenance" of a correspondent account to mean that the accounts were "unrelated to the fraud alleged" and that there were no other allegations of "affirmative conduct allegedly required of the [defendant] in connection with the contract . . . .").

However, a defendant's selection and repeated use of a New York correspondent account, where the specific selection was at the defendant's direction, can show that the contacts with "New York [are] not random or fortuitous but sufficiently purposeful to satisfy New York's long-arm statute." *Spetner*, 70 F.4th at 640–42.  This is true even though "New York remains the 'national and international center for wholesale wire transfers' . . . ." *Id.* at 642 (quoting *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370, 568 N.Y.S.2d 541, 570 N.E.2d 189 (1991)).  Where a foreign bank alternative may be less attractive to a defendant, that is only further support for the proposition that the purpose of holding the New York correspondent account is "to gain convenient access to New York's financial system." 70 F.4th at 642.

Defendant further argues that there is no support for exercising jurisdiction over it as it "never invested in the Funds *at all*. Rather, it acted purely as a custodian facilitating *client* investments, made in the names of those clients and for their benefit . . . . [HSBC Lux] was not interested in whether the Funds would invest the proceeds of their share sales with BLMIS." Reply at 7, ECF No. 274 (emphasis in original).  Defendant alleges that the investments were non-discretionary and were all made on an "execution-only, custodial, client-directed investment." Hr'g Tr. at 37:15–17, ECF No. 335; *id.* at 38:10–12 (arguing that HSBC Lux and related entity HSBC Suisse "simply received client money and client instructions to purchase the Fairfield fund shares [then] went out and purchased them for clients."); *see also* Reply at 3, ECF No. 274 (arguing that HSBC Lux's "role was solely to execute its clients' instructions to purchase shares in the Funds.").

The Second Circuit has determined that allegations of a "foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency,

and the predictable jurisdictional and commercial law of New York and the United States." *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (2012)); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum.")." [13] A course of dealing can be established through as little as "14 currency exchange transactions between" two foreign entities made to a New York bank. *Al Rushaid*, 28 N.Y.3d at 325.

The Liquidators have provided support for the allegation that HSBC Lux chose to use U.S. correspondent accounts at least "33 times over a period of over ten years" to send and receive payments between it and Sentry. Opp'n at 10, ECF No. 260; *see also* Konanova Decl. Exs. 1, 3, 32–34 (subscription forms from 199 and 2005 and redemption forms from 2004, 2005, and 2006). The subscription and redemption forms show that Defendant designated the U.S.-based correspondent bank, to which Sentry accordingly sent payments. Opp'n at 10–11; *see, e.g.*, Konanova Decl. Ex. 35 (showing a request for redemption from Sentry). The repeated use of correspondent accounts demonstrates Defendant's purposeful availment of the banking system of New York and the United States. Whether discretionary or execution-only, Defendant chose to use New York-based accounts while foreign options existed.

The Liquidators have also provided a decision of the Privy Council, explaining that BVI law can look to the registered shareholder as legal owner. *See Skandinaviska Enskilda Banken AB (Publ) v. Conway*, [2019] UKPC 36 ¶¶ 2, 4, 88, available at https://www.jcpc.uk/cases/docs/

---

[13] Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent." 70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

jcpc-2017-0022-judgment.pdf.  The Privy Council explained that the "registered holder of

redeemable shares, . . . not [the mutual funds, on whose behalf the holder subscribed], was the

person entitled to be paid the proceeds of the redemption of the shares, and it was the person to

whom, in law, the payment was made." *Id.* ¶ 88.  It made no difference whether the company in

which the holder invested knew that the holder was a nominee for other entities. *Id.*  Here,

Defendant was entitled to be paid proceeds of the shares under Article 8 of the Fairfield Sentry

Articles of Association.  Konanova Decl. Ex. 46, ECF No. 261 (stating that the holders of shares

shall be entitled to redemption of shares); *see also id.* Ex. 3 at -647, 667 (Sentry subscription

agreement stating that the "Subscriber shall become a shareholder of the Fund . . . ."); *see also*

Molton Decl. Ex. 1, ECF No. 315 (Sigma Articles of Association).  Defendant was the

shareholder of investments in the Fairfield Funds, it was entitled to be paid the proceeds of the

redemption of the shares, and it was the entity to whom payment was made; for these purposes, it

makes no difference whether Defendant invested on behalf of others.

### 2.  Defendant's Business Contacts with the Forum

The Liquidators assert that Defendant "intentionally invested in BLMIS feeder funds

Sentry and Sigma knowing that the Funds were designed to subsequently invest that money in

New York-based BLMIS. [HSBC Lux] is subject to this Court's jurisdiction with respect to its

Sentry and Sigma redemptions as a result of that conduct."  Opp'n at 15, ECF No. 260.

Defendant describes the allegations that it knew the subscription payments into the Fairfield

Funds would be invested in BLMIS in New York as the unilateral activity of a third-party

foreign administrator of the Funds, which Defendant argues is not appropriate to consider under

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984). *See* Mem. L. at

10, ECF No. 206.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 418. The Supreme Court found that "one trip" to the forum "for the purpose of negotiating the transportation-services contract . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416. The Liquidators, however, have described more substantial contacts here.

First, the Liquidators point to the documents given to HSBC Lux by the Funds' U.S.-based manager, Fairfield Greenwich Group ("FGG"), which made it "clear that the main purpose of the Funds' existence was to invest in BLMIS" in New York. Opp'n at 8, ECF No. 260; *see* Konanova Decl. Ex. 30–31, ECF No. 261 (Private Placement Memoranda of Sentry and Sigma). Defendant received memoranda at the time it subscribed into the Fairfield Funds that explained the objective of the funds was to "achieve capital appreciation of its assets through the purchase and sale of securities principally by utilizing an options trading strategy described as 'split strike conversion,'" a strategy that the memoranda explained was carried out by Bernard L. Madoff Investment Securities LLC. Konanova Decl. Ex. 30 at FG-05554149, -161–163; *see also id.* Ex. 31 at FG-05552272, -278–79, -287 (explaining that Sigma would "seek to achieve capital appreciation of its assets by purchasing shares in Fairfield Sentry Limited" which utilizes the split strike conversion strategy). Sentry would allocate no more than 5% in aggregate of its net asset value in investments other than BLMIS's split strike conversion strategy. *Id.* Ex. 30 at FG-05554162; *id.* Ex. 31 at FG-05552279. Sentry's memorandum identified BLMIS as a sub-custodian of the Fund. *Id.* Ex. 31 at 00000662. These documents show that Defendant was

aware at the time that its investments in the Fairfield Funds was effectively an investment in BLMIS in New York.

In August 2018, this Court held that it does not have personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund." *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018). The Liquidators here rely on the subscription agreements and private placement memoranda not to show consent, but to show that when Defendant invested in Fairfield Sentry, it did so knowing that it would avail itself of the benefits and protections of New York. Opp'n at 22–23, 32; Konanova Decl. Exs. 3, 32–33, 78–81. The subscription agreements, in this way, support the Plaintiffs' showing of contacts with the forum.

The Plaintiffs have supplied further evidence to support the allegations of contacts. Exhibits show that "[h]igh-ranking [HSBC Lux] employees visited Madoff's office in New York in 2002 and 2004." Opp'n at 32, ECF No. 260. In July 2002, an employee of the HSBC [Lux]'s predecessor-in-interest, Bank of Bermuda (Luxembourg) SA, faxed to "Mr. Madoff" as a follow-up to their meeting nine days earlier a letter confirming details of a sub-custody agreement "revised to address the client account name issue" that he and Madoff discussed. Konanova Decl., Ex. 10; *see also* Ex 11 (call notes explaining the subject of the July 2002 meeting with Madoff). In February 2004, that employee wrote to Madoff via fax that he "look[s] forward to meeting at [Madoff's] office on March 3rd at 4.30pm." *Id.* Ex. 18. One HSBC Lux employee met with Madoff in October 2005 in New York to discuss the audit to be conducted by KPMG, an auditor retained by Defendant's parent company for the benefit of both parties. *Id.* Ex. 15. ("I have told him to contact me if he gets into any difficulties. I think this should go well."); Am.

Compl. ¶ 113, ECF No. 167.  An employee of the Defendant requested that an employee of an affiliate HSBC entity raise issues with Madoff on the employee's next visit to Madoff in New York concerning bi-monthly transaction statements. Konanova Decl. Ex. 57 ( "[W]e would feel more comfortable if we receive written confirmation directly from Madoff. We would appreciate if you could raise this issue when meeting with Madoff. As you can imagine we are quite exposed to NAV delays if the delivery will not occur in a timely manner. I attach for your information the fax sent to Madoff with the requested deadlines/statements.").  Defendant made sure to have any issues "raised on behalf of" itself when another entity would "be visiting Bernard Madoff." *Id.* Ex. 61.  These documents demonstrate more than mere purchases or a one-time visit to the forum.  The Liquidators have demonstrated facts supporting continuous and systemic contacts with the forum.

### 3.  Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction

The Court will address HSBC Lux's remaining arguments that the Defendant's alleged contacts are not jurisdictionally relevant under Supreme Court precedent.  Mem. L at 11–14, ECF No. 206.  Defendant argues that the Plaintiffs' allegations amount to "mere knowledge that Sentry would invest money it raised in the BVI with BLMIS in New York," which it states is "insufficient as a matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014).  *Id.* at 11.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as he "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada."  *Walden*, 571 U.S. at 289. The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."  *Id.*  As the Supreme Court

explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at 285. Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investment into BLMIS in New York and interactions with the Fairfield Greenwich Group, as described above, demonstrate that HSBC Lux took affirmative actions on its own apart from the conduct of the Plaintiffs. *See, e.g.,* Am. Compl. ¶¶ 11–12, 20, ECF No. 167; Opp'n at 21, ECF No. 260. In addition to supporting allegations of meetings between HSBC Lux employees and FGG in New York, the Liquidators have shown that the Defendant knew with certainty and intended that by investing in the Funds Defendant's money would enter into U.S.-based BLMIS. Am. Compl. ¶¶ 42–86; Opp'n at 21. This certainty can be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-based BLMIS. *See* Konanova Decl.*, Exs. 30–31 (private placement memoranda of Sentry and Sigma). Moreover, Defendant conducted due diligence investigations and benefited from investigations from its predecessors that confirmed the investments would be made with BLMIS in New York. *See id.* Ex. 20 (2005 email of HSBC Lux executive discussing due diligence reviews of Madoff); *id.* Ex. 8 (HSBC Lux employee noting transparency issues with Madoff); *id.* Ex. 9 (noting 2005 email regarding BLMIS's operations and a potential meeting with Madoff). The relevant contacts were not driven by the conduct of the Fairfield Funds alone; they were the result of Defendant's efforts to invest in BLMIS in New York.

Defendant next argues that the Liquidators' evidence of Defendant's contacts with the United States amount to little more than the stream of commerce theory rejected by *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882–86 (2011), where the Court stated that "it is not enough that [a] defendant might have predicted that its goods will reach the forum," but rather the defendant must "engage[] in conduct purposefully directed at [the forum]." Mem. L. at 13, ECF No. 206. The Liquidators argue that the Defendant did not merely expect that the investments would reach the United States, but rather that Defendant's express purpose of investing in the Fairfield Funds was to invest with BLMIS in New York. Opp'n at 22, ECF No. 260 ("Liquidators argue that [Defendant] chose to invest in the Funds with the specific purpose of having its clients' money invested in U.S.-based BLMIS, and that it did so while knowing that the Funds were obligated under the investment contracts to facilitate that aim, including by directing at least 95% of funds invested to BLMIS."). This conduct was purposefully directed at the forum.

The Court thus finds that Defendant's selection and use of U.S. correspondent accounts and communications concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong. The contacts are not random, isolated, or fortuitous. The contacts demonstrate HSBC Lux's purposeful activities aimed at New York in order to effectuate transfers from the Fairfield Funds. The Plaintiffs have thus provided facts that sufficiently support a prima facie showing of jurisdiction over the Defendant.

**C.**  **Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct**

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. ----, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d

225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the

defendant's in-state conduct" is not required. *Id.* at 1027. Instead, a court need only find "an

affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*),

594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the

jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable

to say that the defendant is subject to personal jurisdiction even though the acts within the state

are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the claims "here are not about, and do not arise out of, any

investment with BLMIS." Mem. L. at 3, ECF No. 206. However, the Liquidators seek

imposition of a constructive trust on funds received with knowledge that the NAV was inflated.

Am. Compl. ¶¶ 180–91, No. 167. The issue of knowledge of the inflated NAV is inextricably

tied to the Defendant's investments with New York-based BLMIS. The allegations are directly

related to Defendant's investment activities with BLMIS through the Fairfield Funds. The

Defendant's contacts with the United States, in investing in the Fairfield Funds and in

communications by employees with FGG form a "sufficiently close link" between the defendant,

the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery*

*Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29,

2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

### D. Whether Assertion of Personal Jurisdiction is Reasonable

If a defendant has sufficient minimum contacts, the Court must then ask "whether the

assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial

justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank*

*Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Where the plaintiff "makes the threshold

showing of the minimum contacts required for [exercising personal jurisdiction], a defendant

must present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable."  *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3

(quoting *Bank Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the

burden on the defendant; the interests of the forum in adjudicating the case; the plaintiff's

interest in obtaining convenient and effective relief; the interstate judicial system's interest in

obtaining the most efficient resolution of controversies; and the shared interest of the states in

furthering fundamental substantive social policies.  305 F.3d at 129.

    The Defendant argues that "the United States' interest in adjudicating this dispute is

minimal at best. The dispute is between foreign parties arising under foreign law pursuant to a

foreign contract for the return of cash sent between two foreign countries in a purely foreign

transaction."  Mem. L. at 21, ECF No. 206.  Defendant further argues that the proceeding is non-

core, ancillary, and only tenable due to Chapter 15 recognition.  *Id.* (citing *In re Fairfield Sentry*

*Ltd.*, 458 B.R. 665, 682 (S.D.N.Y. 2011) (Preska, J.)).

    The Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced.  In

that case, the District Court determined whether the proceeding was core or non-core; it did not

determine whether adjudication or jurisdiction in the United States was reasonable.  *See id.* at

675.  Further, the Court has already found that it has subject matter jurisdiction over these

proceedings.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6,

2018).  Chapter 15 allows for recognition of this proceeding and indicates that the United States has an interest in adjudicating the case.

Defendant argues it is burdened by the potential exposure to civil and criminal liability. Mem. L. at 22, ECF No. 206.  In support of this argument, Defendant cites to a ruling in which the Court granted in part and denied in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures on beneficial holders.  *Id.*; *see* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799.  This Court based that ruling on a comity analysis in light of the then-uncertain "offshore underpinnings for this litigation in its entirety."  *Id.* at 2.  The Court stated in that ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation."  *Id.* (emphasis added).

Defendant has not shown that the interests at stake in that proceeding over ten years ago, are the same as those at stake now.  Although defendants were previously able to identify specific laws in foreign countries that would have been broken by complying with the Court's prior order, HSBC Lux now only describes a potential exposure to liability.  *See* Hr'g Tr. Oct. 28, 2021, ECF No. 200 ("[C]omplying with that order would've required my clients to break the law in Switzerland and Luxembourg. And it wasn't just us saying that, Your Honor. The Swiss government submitted a letter from the embassy saying exactly the same thing.").  This Court lifted the stay and required the Defendant to proceed to discovery in November 2021.  Order Granting Mot. to Compel, ECF No. 211.  The July 2012 Bench Ruling shows that this Court is capable of alleviating specific burdens identified by a defendant.  The mere potential for exposure to unspecified liability is not a burden which renders exercise of jurisdiction unreasonable.

Defendant argues that there is "no reasonable interest in having this dispute adjudicated here" as the Plaintiffs have "forum shopped their claims to New York" instead of having the claims heard abroad, where they would "most naturally be heard."  Reply at 20, ECF No. 274. Defendant states that there is a burden placed on the forum as the "witnesses and evidence in this action are all overseas . . . ."  *Id.*

The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023).  HSBC Lux has participated in this litigation for over ten years.  *See, e.g.,* Mot. to Withdraw Reference, ECF No. 2.  Defendant is represented by U.S. Counsel and has U.S. affiliates operating in the New York area.  Opp'n at 33, ECF No. 260.  Furthermore, the United States has a strong interest in ensuring the integrity of its financial systems.

Defendant has alleged that other forums may be able to hear the claims.  What it has not done is demonstrate how this forum would fail to provide effective relief.  *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3.  Defendant does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023).  The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable.  The

Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . . ." *See Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154.

### E.   Application of the District Court's Opinion on Jurisdiction Under FSIA

HSBC Lux filed a letter with this Court on October 11, 2023, stating that the recent opinion in *Pub. Inst. for Soc. Sec. v. Picard (In re BLMIS)*, No. 22-cv-8741-GHW, 2023 WL 6143985 (S.D.N.Y. Sept. 20, 2023) ("*PIFSS*"), supports its Motion to Dismiss for lack of personal jurisdiction.  HSBC Lux Letter Regarding *PIFSS*, ECF No. 330.  The Liquidators filed a letter in response arguing that the analysis used by the Court in *PIFSS* is inapplicable to an analysis of personal jurisdiction.  *See* Pls.' Response Letter, ECF No. 331.

The Foreign Sovereign Immunities Act provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  Under the third clause of the commercial activities exception to the FSIA, a foreign sovereign is not immune from a Court's jurisdiction in a case "in which the action is [i] based . . . upon an act outside the territory of the United States [ii] in connection with a commercial activity of the foreign state elsewhere and [iii] that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

*PIFSS* found that the "redemption request and receipt of funds" by the defendant, a foreign government entity, "did not have a direct effect in the United States."  *PIFSS* at *8.  The "possibility that the transfer transited through a New York correspondent bank on its way between the foreign bank accounts of two foreign entities does not matter—the brief transit of funds through a U.S. correspondent account is not 'legally significant.'"  *Id.* at *7.  The Court in PIFSS further stated that because the defendant's "redemption request to Fairfield Sentry in

December 2003 occurred after BLMIS's most recent payments to Fairfield Sentry, it cannot be the case that PIFSS's redemption request triggered any movement of funds from BLMIS to Fairfield Sentry." *Id.*

Defendant argues that the Liquidators' arguments here are the same as those posed by the Trustee made in *PIFSS*. HSBC Lux Letter Regarding *PIFSS* at 2, ECF No. 330 ("Here, the Fairfield Liquidators make the identical argument, arguing at length that the HSBC Defendants are subject to personal jurisdiction because redemption payments made by the Fairfield Funds from their bank account in Ireland were momentarily routed through correspondent bank accounts in New York."). HSBC Lux asserts that the "Second Circuit has recognized, the analysis under 28 U.S.C. § 1605(a)(2) and the minimum contacts under the due process clause for personal jurisdiction are 'essentially identical.'" *Id.* (quoting *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 760–61 (2d Cir. 1998)).

The Liquidators argue that *PIFSS* is inapplicable to this case as the "tests for FSIA's commercial activities exception and for personal jurisdiction are not the same." Pls.' Response Letter at 1, ECF No. 331. The Liquidators further argue that "there is no indication in any of the case law cited by the HSBC Defendants that . . . activity not sufficient for the commercial activities exception to apply is necessarily also not sufficient for personal jurisdiction . . . ." *Id.* at 2. The Court in *PIFSS* denied the Public Institution for Social Security's appeal of the Court's order denying dismissal for lack of personal jurisdiction. *Pub. Inst. for Soc. Sec. v. Picard*, No. 1:22-CV-8741-GHW, 2023 WL 3293648, at *1 (S.D.N.Y. May 5, 2023).

An appeal based on personal jurisdiction was not warranted at the time, as this Court relied on evidence, "in combination with Trustee's complaint, that supported a prima facie case of jurisdiction over PIFSS." *Id.* at *5. The District Court stated:

> As the Bankruptcy Court recognized, to survive a motion to dismiss for lack of personal jurisdiction, the Trustee was only required to "make a prima facie showing that jurisdiction exists." Order at 8 (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018)). And to satisfy that requirement, the plaintiff need only plead "good faith, legally sufficient allegations of jurisdiction"; no further proof of jurisdictional facts is required. *Id.* at 9 (quoting *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013)).

*Id.* at *4. *PIFSS* focused on the defendant's challenge to the Court's subject matter jurisdiction on the basis of foreign sovereign immunity. 2023 WL 6143985, at *1 ("This case sits at the crossroads of bankruptcy and sovereign immunity."). HSBC Lux moves to dismiss based on personal jurisdiction. HSBC Lux is not a foreign sovereign, nor is it challenging subject matter jurisdiction. *PIFSS* is not clearly applicable to this situation, and Defendant's proffered case law does not convince the Court otherwise.

In *Rein*, the Second Circuit recognized "the two kinds of jurisdiction—subject matter and personal—are interrelated under the FSIA." *Rein*, 162 F.3d at 759. The Second Circuit recognized that it is possible to make a finding on subject matter jurisdiction without making a finding on personal jurisdiction. *Id.* ("It does not follow, however, that a court cannot decide issues of subject matter jurisdiction without at the same time making definitive findings as to personal jurisdiction."). Because review of personal jurisdiction is not necessary for review of subject matter jurisdiction, the Second Circuit "conclude[d] that the issues of subject matter jurisdiction and personal jurisdiction are not inextricably intertwined in th[at] case." *Id.* The Second Circuit then explicitly rejected the argument that "under the FSIA, personal jurisdiction and subject matter jurisdiction are interrelated sufficiently to justify the exercise of pendent appellate jurisdiction." *Id.* at 760.

The Second Circuit explained that by finding a direct effect in the United States in a prior case, it "necessarily had also decided that the defendant had minimum contacts with the United

States sufficient to establish personal jurisdiction over it in an American forum without violating the requirements of due process." *Id.* (analyzing *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127 (2d Cir. 1998)). "The finding of subject matter jurisdiction under the commercial activities exception also entailed a finding of minimum contacts, and that finding was therefore conclusive on the personal jurisdiction question as well." *Rein* 162 F.3d at 760. Whether the "issues of subject matter jurisdiction and personal jurisdiction were inextricably intertwined" depended on the specific issues of personal and subject matter jurisdiction at issue. *Id.* at 760–61.

HSBC Lux would invert the Second Circuit's reasoning to conclude that where there is no direct effect, there are no minimum contacts. *See id.* There is no support in *Rein* for this proposition.[14] Furthermore, the Court cannot rule on a challenge to its exercise of personal jurisdiction over a defendant, who is not a foreign sovereign, based on whether that defendant's conduct would meet the standard for exercising subject matter jurisdiction under an exception to FSIA. *See Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for A.W. Galadari*, 810 F. Supp. 1375, 1388 (S.D.N.Y. 1993), *rev'd on other grounds*, 12 F.3d 317 (2d Cir. 1993) ("Personal jurisdiction under the FSIA is a matter separate and apart from the issue of subject matter jurisdiction. "); *see also Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos*, 712 F. Supp. 383, 390 (S.D.N.Y. 1989) ("Personal jurisdiction over foreign sovereign instrumentalities under the FSIA involves a scrutiny distinct from the subject matter

---

[14]    Defendant also relies on *Boeing Co. v. Egyptair*, No. 05-5986-CV, 2007 WL 1315716, (2d Cir. May 7, 2007) in support of its argument. *Boeing* analyzed jurisdiction in the same context as *Rein* to find that commercial contacts sufficient for exceptions to FSIA were also sufficient for minimum contacts. 2007 WL 1315716, at *2 ("Assuming, arguendo, that the minimum contacts requirement of the Due Process Clause applies to foreign instrumentalities such as [defendant], . . . we have no difficulty finding that there were sufficient minimum contacts here.").

jurisdiction inquiry . . . .").  The reasoning in *PIFSS* is thus inapplicable to the issue of personal jurisdiction.

In its November 28, 2023, letter, the Defendant argues that the arguments made in support of a finding for "direct effect" are "precisely the same type of supposed U.S. contacts on which the Liquidators seek to ground personal jurisdiction in this case."  Letter from HSBC Lux regarding *Tensyr* at 2, ECF No. 342.[15]  This again elides the differences between the standards for personal jurisdiction and exceptions to foreign sovereign immunity.  Defendant's argument also flattens the Court's analysis of conduct for subject matter and personal jurisdiction when it states "to the extent that there is daylight between the tests for satisfying the commercial activities exception and personal jurisdiction, more significant contacts are required to establish the personal jurisdiction under the Constitution than subject matter jurisdiction under the commercial activities exception."  *Id.* at 3.  The Court does not use a single metric to gauge personal jurisdiction and exceptions to sovereign immunity.  The tests are different.

---

[15]    The Plaintiffs filed a letter on November 21, 2023, in which they wrote to bring to this Court's attention the recent decision in *Picard v. Tensyr Limited et al.* Case. No. 10-05353 (S.D.N.Y. Bankr. Nov. 3, 2023).  Pls.' Nov. 21 Letter Regarding *Tensyr*, ECF No. 341.  Following the Defendant's November 28, 2023, letter, the Plaintiffs filed a single-page letter in reply, stating that they "stand on the arguments set forth" in previous filings. Pls.' Dec. 1 Letter in Reply at 1, ECF No. 343.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**


Dated:  New York, New York
        <u>January 29, 2024</u>

                                   /S/ John P. Mastando III_____
                                   THE HONORABLE JOHN P. MASTANDO III
                                   UNITED STATES BANKRUPTCY JUDGE