**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*FOR PUBLICATION*

| | |
|---|---|
| In re:<br><br>Fairfield Sentry Limited, et al.<br><br>              Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 10-13164 (JPM)<br><br>(Jointly Administered) |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>HSBC SECURITIES SERVICES (LUXEMBOURG) S.A., et al.,<br><br>              Defendants. | Adv. Pro. No. 10-03630 (JPM) |

<u>**MEMORANDUM OPINION AND ORDER DENYING**</u>
<u>**DEFENDANT'S MOTION TO DISMISS**</u>

*APPEARANCES:*

**GILMARTIN, POSTER & SHAFTO LLP**
Counsel for *Private-Space Ltd.*
845 Third Avenue, 17th Floor
New York, NY 10022
By:    Michael C. Lambert

**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs Joint Liquidators*
Seven Times Square
New York, NY 10036
By:    Jeffrey L. Jonas
          David J. Molton
          Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of the Defendant, Private-Space Ltd. ("Private-Space" or "Defendant"), to dismiss the Fourth Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction.  Mot. to Dismiss, ECF[1] No. 201.  The Court held a hearing on the Motion to Dismiss on May 3, 2024 (the "Hearing").  For the reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip. Order, ECF No. 130.  Personal jurisdiction is contested by the Defendant and will be discussed below.

## III.    BACKGROUND

This adversary proceeding was filed on September 21, 2010.  Compl., ECF No. 1. Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma" and, together with Sentry, the "Fairfield Funds") filed the Amended Complaint on August 11, 2021.  Am. Compl., ECF No. 167.  Via the Amended Complaint, the Liquidators seek the imposition of a constructive trust

---

[1]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03630-jpm unless otherwise noted.

and recovery of over $84 million in redemption payments made to HSBC Securities Services

(Luxembourg) SA ("HSSL") by Sentry and Sigma.  *Id.* ¶ 1; *id.* Exs. A–B.[2]  Of that amount,

Defendant allegedly received over $17 million[3] through redemption payments from its

investment in Sentry and Sigma.  Opp'n at 1, ECF No. 326; Molton Decl. Ex. 9, ECF No. 327

(Sentry Redemption Transaction Records).

### A. The BLMIS Ponzi Scheme

This adversary proceeding arises out of the decades-long effort to recover assets of the

Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[4]  Am. Compl. ¶ 1.

HSSL allegedly invested, either for its own account or for the account of others, into several

funds, including Sentry and Sigma, that channeled investments into BLMIS.  *Id.* ¶¶ 2, 5, 16.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of

bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 42–43;

*see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools

money from numerous investors and then places it into a 'master fund' on their behalf. A master

fund—what Madoff Securities advertised its funds to be—pools investments from multiple

---

[2]    At the time of the filing of the Fourth Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the Beneficial Owners.  With respect to Private-Space, the Amended Complaint states in relevant part that "[b]ased on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Private Space Ltd."  Am. Compl. ¶ 40.  The Amended Complaint alleges that several other defendants may have received redemption payments made to HSSL.  *Id.* ¶¶ 35–49.  This opinion concerns only those payments that the Plaintiffs allege were paid to Private-Space.

[3]    Of that total U.S. Dollar amount, the Plaintiffs allege that Private-Space "received $13,237,798.21 from Sentry and approximately €2,824,225.24 from Sigma through the redemption payments at issue. [T]he Liquidators have applied the exchange rate as of the date of each redemption payment out of Sigma and calculated the dollar value of the Sigma redemptions to be approximately $3,828,519.74. This number may vary if the Court ultimately determines that a different exchange rate applies."  Opp'n at 1 n.2, ECF No. 326.

[4]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts.  *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

feeder funds and then invests the money."). Fairfield Sigma, in contrast, was an indirect feeder fund, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currency. Am. Compl. ¶¶ 42–43. BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 5–8, 14. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 8–9, 13–15, 43, 56–48.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 8. HSSL was allegedly "one such investor." *Id.* To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 45. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 46. The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id.* The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 48. The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id.*

Private-Space is a corporation organized under the laws of the British Virgin Islands ("BVI"). Mem. L. at 1–2, ECF No. 202; Opp'n at 5, ECF No. 326.[5] Private-Space is alleged to

---

[5]      The Amended Complaint alleges that Private-Space is a corporate entity organized under the laws of Monaco with a registered address in Monaco. *Id.* ¶ 39. Private-Space was originally incorporated in the Netherlands Antilles as Private Space N.V. "and then continued to the [BVI] in June 2004 . . . ." Bergamasco Decl. ¶ 4, ECF No. 203. Private-Space has stated that although it was "incorporated in the BVI, the record shows that PSL's business activities relating to its investments in Sentry and Sigma were conducted primarily in the Principality of Monaco, where its representatives and primary investment advisory firm Fedesa . . . were physically located and Plaintiffs purported to serve PSL by mail." Reply at 2 n.4, ECF No. 337. Private-Space's Further Amended

have retained HSSL as its agent to invest in and recover redemption payments from the Fairfield Funds.[6] Opp'n at 2. From November 2003 to July 2007, Private-Space allegedly subscribed for 26,400 shares in Sentry and Sigma. *Id.* at 3; Molton Decl. Exs. 3–5, 7–8. Private-Space eventually redeemed a total of $17,066,497.95 worth of shares from the Fairfield Funds. Opp'n at 11. In addition to these redemption payments, Private-Space allegedly received fourteen rebate payments between July 2005 and April 2007 for introducing clients to the Fairfield Funds. *Id.* at 12. At the directions and instructions of HSSL, as the purported agent for Private-Space, "some . . . of the Redemption Payments were received at . . . designated United States-based bank accounts." Am. Compl. ¶ 50.

Fedesa S.A.M. ("Fedesa"), a "multi-family office based in Monaco," was the primary investment advisory firm of Private-Space at the relevant times. Opp'n at 5, ECF No. 326; Reply at 2 n.4, ECF No. 337; Declaration of Lucio Bergamasco ¶ 6, ECF No. 338 (Bergamasco Reply Decl.). Fedesa allegedly "acted on Private-Space's behalf in evaluating potential investment in the [Fairfield] Funds, monitoring performance of Private-Space's investments, and redemption of Private-Space's investments." *Id.* (citing Declaration of David Molton in Support of Liquidators' Opposition ("Molton Decl."), Exs. 10, 12, ECF No. 327). HSSL was a corporate entity organized under the laws of Luxembourg with a registered address in Luxembourg. *Id.* ¶ 33. It allegedly invested in one of many BLMIS feeder funds for itself or others. *Id.* ¶ 2.

---

Answers and Objections to the Plaintiffs' first set of interrogatories states, with respect to persons "involved in evaluating investments in Sentry and Sigma," that "Lucio Bergamasco, a PSL director located in Monaco, was also involved, but to a lesser degree than [the now-deceased former PSL director]." Molton Decl. Ex. 12 at 6, Interrog. No.2, ECF No. 327.

[6]    Private-Space's initial investment in Sentry in 2003 was made through Citco Bank Nederland N.V., which was "PSL's former custodian." Reply at 7 n.18, ECF No. 337; Opp'n at 8, ECF No. 326. This investment in Sentry was "originally registered in that custodian's name before being transferred to HSSL in 2005." Reply at 6–7; *see also* Molton Decl. Ex. 3 at -256 (Nov. 2003 Subscription Order).

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008. Am. Compl. ¶ 168. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 169. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 170–71. Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 172.

The Amended Complaint alleges that HSSL, the purported agent of Private-Space, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 184. The Amended Complaint further asserts that between 2001 and 2008, HSSL recognized the improbability of the returns from BLMIS, and employees of HSSL "continued to identify multiple additional indicia of BLMIS-associated fraud." *Id.* ¶ 185. These indicia included Madoff's failure to segregate accounts and the lack of a reliable independent auditor. *Id.* In the face of red flags such as these, HSSL purportedly "continuously and deliberately failed to take steps to assuage the concerns associated with BLMIS." *Id.*

**B.  <u>The Prior Litigation and Procedural History</u>**

The Fairfield Funds were put into liquidation in the BVI in 2009. *Id.* ¶¶ 26–28. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 28. Pursuant to the appointment order of the BVI court,[7]

---

[7]     The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

the "Foreign Representatives are responsible for all aspects of the Funds' business, including

protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 177.  The Liquidators

commenced actions in the BVI against a number of investors who had redeemed shares of the

Fairfield Funds before the collapse of the scheme.  Mem. L. at 6, ECF No. 202; *Fairfield Sentry

Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also In re Fairfield

Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284

(Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the

Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings.

Am. Compl. ¶ 29.  This Court granted that recognition on July 22, 2010.  *Id.*  All cases filed by

the Plaintiffs were administratively consolidated before this Court in November 2010.  *See*

Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary

proceedings including, *inter alia*, mistaken payment and constructive trust.[8]  Compl. ¶¶ 61–84,

ECF No. 6; *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the U.S.

proceedings pending resolution of the BVI proceedings.  *See* Am. Order Staying Redeemer

Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343,

at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for

restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014]

---

[8]       Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's
Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the
implied covenant of good faith and fair dealing.  *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at
463, (S.D.N.Y. 2022).

UKPC 9 ("*Migani* ").[9]  The Privy Council held that the Plaintiffs' claims for restitution in the

BVI to recover redemption payments arising out of transactions governed by the Funds' Articles

of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption

payments thus depended on whether Sentry was bound to make those payments under the "true

NAV per share, ascertained in the light of information which subsequently became available

about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the

time of redemption."  *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively

determined at the time of the subscription or redemption.  *Id.* ¶ 21.  The redemption payments

made under the NAV were thus not subject to restitution and the payee was not unjustly enriched

by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–19.

    After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco,

the Fairfield Fund's administrator, when it issued redemption certificates.  *See In re Fairfield

Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018).

Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith

when it issued certificates for redemptions and was aware that the NAV was inflated at the time.

*See id.* at *6.  The Plaintiffs argued that the certificates would not be binding under the Funds'

Articles if they were not issued in good faith.  *Id.*

    In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of

Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where

a Defendant knew the NAV was inflated at the time of redemption."  *Fairfield II*, 596 B.R. at

295.  Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive

---

[9]    *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without
numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL
1219748.

trust against the so-called "Knowledge Defendants" to proceed.  *Id.* at 301 ("The suggestion that

the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the

contract and requires restitution lacks support. The only exception concerns the Knowledge

Defendants that received redemption payments with the knowledge that the NAV was wrong. In

those circumstances, the Liquidators may seek to impose a constructive trust.").  In December

2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair

preferences and undervalue transactions.  *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1

(Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived.  *Id.*; *In re Fairfield

Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021)

("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022).  The Liquidators filed a further motion to

amend the complaints against the Knowledge Defendants.  Mot. to Amend, ECF No. 146; Mot.

to Amend, Adv. Pro. No. 10-03496, ECF No. 3737.  On August 5, 2021, this Court granted the

motion to amend the complaint and lifted the stay of the redeemer actions.  Order Granting Mot.

to Amend, ECF No. 166; Order Lifting Stay of Redeemer Actions, ECF No. 165.

### C.  <u>The Pending Motion</u>

The Amended Complaint seeks the imposition of a constructive trust on the redemption

payments received from the Fairfield Funds.  Am. Compl. ¶ 191, ECF No. 167.  The Amended

Complaint alleges that Defendant's purported agent, HSSL, had knowledge of the fraud at

BLMIS and therefore knowledge that the NAV was inflated.  *Id.* ¶ 184.  "By reason of their

receipt of some or all of the Redemption Payments, Defendants[10] have been unjustly enriched to

---

[10]     As stated *supra* footnote 2, the Amended Complaint alleges that several other defendants may have
received redemption payments made to HSSL.  *Id.* ¶¶ 35–44.

the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma."

*Id.* ¶ 188.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts

recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully

blinds himself to that fact." *Id.* ¶ 181 (citing 596 B.R. at 293). As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the
> BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary
> duty; second, the beneficial receipt by the defendant of assets which are traceable
> as representing the assets of the plaintiff; and third, knowledge on the part of the
> defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou*

*v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including Private-Space as a

beneficial shareholder of the accounts, purposefully availed themselves of the laws of the United

States and the State of New York by "investing money with the Funds, knowing and intending

that the Funds would invest substantially all of that money in New York-based BLMIS and, upon

information and belief, maintaining bank accounts in the United States, and in fact receiving

Redemption Payments in those United States-based accounts." Am. Compl. ¶ 20, ECF No. 167.

The Amended Complaint further alleges that HSSL as agent for Private-Space "selected U.S.

dollars as the currency in which to invest and execute their transactions in Sentry, upon

information and belief, designated United States-based and/or New York-based bank accounts to

receive their Redemption Payments from the Funds, and actively directed Redemption Payments

at issue in this action into those accounts." *Id.*

The parties engaged in personal jurisdiction discovery between September 2021 and

August 2022.  *See* Scheduling Order, ECF No. 179; Second Am. Scheduling Order, ECF No.

245.  Fact discovery is ongoing in this case.  *See* Ninth Am. Scheduling Order, ECF No. 354.

Defendant has moved to dismiss the Amended Complaint for lack of personal

jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts

with the forum to establish personal jurisdiction over Defendant and that exercising personal

jurisdiction would be unreasonable.  *See* Mem. L. at 3–5, ECF No. 202; *see also* Declaration of

Lucio Bergamasco, ECF No. 203 ("Bergamasco Decl.") (filed in support of the Motion).

The Liquidators filed an opposition to the Motion and submitted the declarations of

David Molton and Sara Joyce in support of their opposition.  Opp'n, ECF No. 326; Molton

Decl., ECF No. 327; Declaration of Sara Joyce ("Joyce Decl."), ECF No. 328.[11]  The Liquidators

argue that exercising jurisdiction over Defendant would be reasonable and that Defendant's

contacts with the United States, through its own actions and those of its purported agent, in

knowingly and intentionally investing in the Fairfield Funds, using U.S. correspondent accounts

to invest in and receive payments from Sentry, and conducting other business activities support

personal jurisdiction.  Opp'n at 2–4, ECF No. 277.  Defendant filed a reply memorandum, along

with a second declaration of Lucio Bergamasco in support of the Motion ("Bergamasco Reply

Decl.") and the declaration of Michael Lambert in support of the Motion ("Lambert Decl."), on

November 16, 2023.  Reply, ECF No. 337; Bergamasco Reply Decl., ECF No. 338; Lambert

---

[11]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal.  At the Hearing on the motion, the Court gave the parties the opportunity to withdraw from the record any previously-sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the opinion.  Hr'g Tr. 12:5–17, ECF No. 357.  None of the parties in this matter requested information withdrawn.  The Court will nevertheless refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

Decl., ECF No. 339.  This Court reviewed the above filings and held a hearing on the Motion on

May 3, 2024.  *See* Hr'g Tr., ECF No. 357.

## IV.     DISCUSSION

### A. The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process

requires that the defendant have sufficient minimum contacts with the forum in which the

defendant is sued "'such that the maintenance of the suit does not offend traditional notions of

fair play and substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501,

516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"In adversary proceedings, courts must determine whether the defendant has minimum contacts

with the United States, rather than with the forum state."  *Picard v. Fairfield Greenwich Grp.* (*In

re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman

Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)).  "When jurisdiction is satisfied

through Bankruptcy Rule 7004,[12] a bankruptcy court need not address its state's long-arm

statute."  *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124

F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the

forum, and the litigation," a relationship that "must arise out of contacts that the defendant

himself creates with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations

---

[12]     "The summons and complaint and all other process except a subpoena may be served anywhere in the
United States."  Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant
served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the
United States."  Fed. R. Bankr. P. 7004(f).

omitted).  There are three conditions necessary for the Court to exercise specific jurisdiction[13]

over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of
> conducting activities within the forum State or have purposefully directed its
> conduct into the forum State.  Second, the plaintiff's claim must arise out of or relate
> to the defendant's forum conduct.  Finally, the exercise of jurisdiction must be
> reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation

marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule

of Civil Procedure Rule 12(b)(2), the Plaintiff "must make a prima facie showing that

jurisdiction exists."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has

considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies

depending on the procedural posture of the litigation."  *Id.* (quoting *Ball v. Metallurgie Hoboken-

Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Following discovery, "the plaintiff's prima

facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of

facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."

*Ball*, 902 F.2d at 197.  "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the

---

[13]     Courts recognize "two types of personal jurisdiction: general and specific jurisdiction.  A state court may
exercise general jurisdiction only when a defendant is 'essentially at home' in the State."  *Ford Motor Co. v.
Montana Eighth Jud. Dist. Ct.*, 592 U.S. -----, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear
Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)).  The
Plaintiffs do not allege that the Court has general jurisdiction over Defendant.  *See* Mem. L. at 10, ECF No. 177
("Plaintiffs do not allege that the Court has general jurisdiction over this French Defendant, which is not "at home"
in the United States, and so Plaintiffs must plead facts supporting the exercise of specific jurisdiction over
Defendant."); Opp'n at 2 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the
forum that relate to the claims at issue).

plaintiff need persuade the court only that its factual allegations constitute a prima facie showing

of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL

5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now

that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy."

*Averbach ,* 2023 WL 5016884, at *6 (citing 722 F.3d at 85). "Plaintiffs need only show that

their prima facie showing of jurisdiction is factually supported." *Id.* at *6. When considering a

motion to dismiss before or after jurisdictional discovery has taken place, "the court must

'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all

doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at

197).

### B. <u>Analysis of Purposeful Availment</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the

defendant purposefully availed itself of the privilege of doing business in the forum and could

foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68,

82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,

170 (2d Cir. 2013)). For specific personal jurisdiction, "'[c]ourts typically require that the

plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the

episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful

contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine

Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with

the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or

other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an

insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*,

571 U.S. at 134) (alteration in original). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

Private-Space asserts that "Plaintiffs have elsewhere affirmatively argued that their claims are 'purely foreign.'" Mem. L. at 2, ECF No. 202. Defendant points to the Plaintiffs' arguments before the District Court, wherein Plaintiffs argued that "every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States." *Id.*; *see also* Pls.-Appellants' Opening Br. for Second Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[14] safe harbor. *See* Opening Brief at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

---

[14]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction.  To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States."  *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016).  To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test."  *Licci*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

The Plaintiffs argue that because this Court "has already considered the facts and law relevant to HSBC Lux and found personal jurisdiction, if the Court now agrees with the liquidators that HSBC Lux['s] conduct can be imputed to Private Space . . . there is little more that needs to be done here [and] Private Space's motion should be denied."  Hr'g Tr. 64:4–9, ECF No. 357.[15]  Private-Space accepts that "it would appear that HSSL or affiliates of HSSL did have meetings with Madoff representatives in the United States, contacts that" this Court cited to "in the decision denying HSSL's motion to dismiss."  *Id.* 57:18–23.  However, Private-Space argues that HSSL's role was a "purely ministerial one that was limited to acting on Private Space's instructions."  *Id.* 57:25–58:2; *see also* Reply at 13, ECF No. 337 (arguing that the scope

---

[15]    Nearly all of the jurisdictional contacts alleged by the Plaintiffs were accomplished through the Defendant's purported agent, HSSL.  *See* Opp'n at 17 ("HSSL subscribed to shares of the Funds pursuant to Private-Space's order of the shares"); *id.* at 26 (describing Private-Space's use of U.S.-correspondent accounts  as "by itself and through its agent"); *id.* at 34 (describing Private-Space's other business activity in the United States as "[f]irst, the long-form subscription agreements signed by HSSL on Private-Space's behalf").  However, the Liquidators do not argue that Private-Space's only contacts with the forum were made through its purported agent, HSSL.  Hr'g Tr. 65:13–15,  The Plaintiffs list certain "additional facts" that allegedly support jurisdiction, including "independently investigat[ing] the funds as potential investments, . . . directly receiv[ing] diligence from the fund's manager, FGG, . . . directly receiv[ing] P[rivate placement memoranda] . . . ."  *Id.* 65:15–24.  The Court will address these contacts *infra*, section sections IV.B.2–4.

15

of Private-Space's supposedly "essentially ministerial actions" does not give rise to a legal basis

for this Court to exercise jurisdiction).  The Court will thus first determine whether HSSL's

contacts can be properly attributed to Private-Space as its agent for purposes of personal

jurisdiction.[16]

### 1.  <u>Whether HSSL Acted as an Agent of Private-Space for Purposes of Personal Jurisdiction</u>

A defendant "can purposefully avail itself of a forum by directing its agents . . . to take

action there." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014).  In the absence of a

formal agency relationship, the Court may impute an agent's conduct within or aimed at the

forum to the principal based on "the realities of the relationship in question rather than the

formalities of agency law." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986).

Even a defendant that "indirectly transacts financial instruments in a forum may have

purposefully availed itself of the forum if the transactions were effected by the defendant's

agent." *In re Eur. Gov't Bonds Antitrust Litig.,* 2020 WL 4273811, at *6 (S.D.N.Y. July 23,

2020).

The question here is the extent to which the business activities of HSSL should, for the

purposes of establishing specific personal jurisdiction in this Court, be imputed to Private-Space.

The Liquidators assert that the Court should "impute knowledge and forum-directed activities"

of HSSL, as an agent, to Private-Space in resolving the instant motion.  Opp'n at 16, ECF No.

326.  Conversely, Private-Space argues that HSSL was not acting as its agent when it engaged in

other relevant conduct.  Reply at 13, ECF No. 337 ("PSL has presented sworn evidence,

---

[16]    That HSSL was an agent of Private-Space is not in dispute.  Private-Space states that it "of course, takes no
issue with the notion that HSSL acted as its agent when it carried out Sentry and Sigma subscription and redemption
instructions from PSL and arranged for the related payments, and that it 'was aware of and consented to [those]
activities.'"  Reply at 12, ECF No. 337.

however, that HSSL acted as PSL's agent only in the very limited capacity of mechanically

implementing subscription/redemption decisions already independently made by PSL, and was

not engaged to, and never did, provide investment advice of any sort to PSL . . . That evidence is

both fully supported by sworn evidence from HSSL . . . and not in any way challenged, but

essentially conceded, by Plaintiffs.").  As a result, Private-Space would conclude that the limited

scope of HSSL's agency relationship precludes the Court from imputing the full breadth of

HSSL's U.S. contacts to Private-Space for purposes of personal jurisdiction.

a.    <u>**Determining the Scope of HSSL's Agency**</u>

"To establish an agency relationship for jurisdictional purposes, plaintiffs must show that

the alleged agent acted in [the forum] for the benefit of, with the knowledge and consent of, and

under some control by, the nonresident principal." *Hau Yin To v. HSBC Holdings, PLC*, 700 F.

App'x 66, 68 (2d Cir. 2017) (citing *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir.

2018)).  The Plaintiffs argue that HSSL's conduct satisfies all three prongs of this test, given that

"(1) HSSL's conduct in investing in the Funds was taken on behalf and for the benefit of Private-

Space; (2) HSSL acted at the direction and under the control of Private-Space; and (3) HSSL

acted pursuant to Private-Space's knowledge and consent."  Opp'n at 16, ECF No. 326 (citing *In*

*re Eur. Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *6).

Private-Space disagrees with the Plaintiffs' analysis and with their conclusion.[17]  In

support of the argument that a principal may not be held liable for the knowledge or actions of an

agent where those acts are outside the scope of the agent's duty, the Defendant relies on cases

---

[17]    The Defendant relies on New York law and argues that, with respect to the law of the scope of agency,
"U.S. law and BVI law would appear to be in accord."  Reply at 13 n.24, ECF No. 337.  The Defendant cites to the
Plaintiffs' expert report, which states that "[k]nowledge gained by an employee or other agent while acting in the
course of his employment for his principal will ordinarily be attributed to his principal: Bowstead and Reynolds on
Agency (20th Ed) paragraph 8-207."  Moss Decl. ¶ 43, ECF No. 40 (filed in support of the Plaintiffs' 2016 motion
for leave to amend the complaint).  The Plaintiffs take no explicit position in their opposition but rely exclusively on
New York law.  See Opp'n at 16–18, ECF No. 326.

that do not involve personal jurisdiction.  Reply at 13, ECF No. 337 (citing *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) ("A principal is not charged with acts or knowledge of an agent when the agent acts outside the scope of the agent's employment"); *Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 351 (S.D.N.Y. 2013) ("[A]ctions outside the scope of an agent's authority are not imputed to the principal."); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 112 (S.D.N.Y. 2009) (actions outside the scope of the agent's role "cannot, as a matter of law, be imputed to [the principal]")).

The Second Circuit has explained that a principal might not be charged with the acts of an agent when that agent, "though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (quoting *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936)).  This exception is narrow in that the Court may still charge the principal with "the acts and knowledge of an agent as long as the agent in some respect served the principal or, stated differently, unless the agent 'totally abandoned' the principal's interests and 'acted entirely for his own or another's purpose.'" *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d at 472 (finding that although the agent committed fraud "during his term of employment . . .  he did it solely to benefit himself" and that the benefit to his employer was "immaterial because [employer] was the victim of [the agent]'s fraud.").

Where, as here, there is no allegation that the agent acted entirely for its or another's own purpose, and where the agent's conduct is alleged to form the basis for exercising personal jurisdiction over the principal, the Court will consider the actions of the purported agent under the Second Circuit's analysis in *Hau Yin To*.  *To*, 700 F. App'x at 68 (holding no agency

relationship existed where Plaintiff failed to establish the exercise of control over the alleged

agent by the principal); *C.f. Grove*, 649 F.2d at 122 (holding no agency relationship existed

where the Plaintiff failed to establish that the principal derived benefit from the activity of the

alleged agent).  Where an agent is alleged to have acted in a manner that satisfies the three

prongs of that agency test, the Court will consider these actions within the scope of the agent's

authority for the principal.  *See, e.g. GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F.

Supp. 2d 308, 319 (S.D.N.Y. 2009) (finding the "numerous assertions of control, knowledge, and

consent" in the amended complaint and affidavits properly stated a prima facie claim of agency

for purposes of personal jurisdiction).  In the present case, the allegations show that HSSL's role

as agent of Private-Space was broad enough that its actions should be imputed to Private-Space

for establishing specific personal jurisdiction.

> **b.  <u>Whether HSSL's Conduct was Performed on Behalf and for the Benefit of
> Private-Space</u>**

In order to establish an agency relationship for purposes of personal jurisdiction, "the

plaintiff must show that the alleged agent acts 'for the benefit of' . . . the non-resident principal .

. . ." *In re Welspun Litig.*, No. 16 CV 6792 (VB), 2019 WL 2174089, at *7 (S.D.N.Y. May 20,

2019) (quoting *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318

(S.D.N.Y. 2009)); *see also CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).

The Plaintiffs argue that the "on behalf/benefit of prong is satisfied when an agent's activities

open the principal to financial gain."  Opp'n at 16, ECF No. 326 (citing *In re Sumitomo Copper

Litig.*, 120 F. Supp. 2d at 336 (finding defendants benefited from agent's trading activities which

could result in gain if financially successful); *GEM Advisors, Inc., S.A.*, 667 F. Supp. 2d at 319

(finding benefit where defendant "stood to benefit" from the alleged agent's "actions and

contracts by receiving some or all of the sale price")).

Private-Space subscribed for shares in the Fairfield Funds through HSSL to profit by indirectly investing in BLMIS.  Opp'n at 17.  Through the activities of its agent, HSSL, Private-Space could obtain financial gain.  *Id.*  The Plaintiffs point to a private placement memorandum of Sentry that explained that BLMIS had at least 95% of Sentry's assets under custody.  Opp'n at 17; Molton Decl. Ex. 1 at -369, ECF No. 327.  Private-Space was the beneficial owner of the shares of Sentry and Sigma that HSSL subscribed to pursuant to Private-Space's orders.  Opp'n at 17.  HSSL's activity in relation to investing in the Funds opened Private-Space, as principal, to financial gain.  The Plaintiffs' evidence sufficiently alleges that HSSL—in implementing the subscription and redemption decisions—acted on behalf of and for the benefit of Private-Space in the forum.

The Defendant agrees that HSSL had numerous contacts with the Fairfield Funds but would limit the scope of HSSL's activities as an agent of Private-Space to contacts with the BVI.  Reply at 13, ECF No. 337 ("[T]here is no legal basis for imputing to PSL whatever knowledge regarding BLMIS HSSL might have had by reason of alleged due diligence or other activities directed by HSSL or various corporate affiliates . . . for purposes having nothing to do with the execution of PSL's investment directions to HSSL.").  The Defendant contends that the "Plaintiffs have made no showing whatsoever . . .  that any BLMIS due diligence . . . was done for the benefit of . . .  PSL" and states that the alleged due diligence activities had nothing to do with "the services that HSSL provided to its clients . . . that invested in the Funds."  *Id.* at 14.

However, HSSL's activities cannot be seen as exclusively limited to transactions in the BVI with the Fairfield Funds.  The Plaintiffs allege that when HSSL, "on behalf of and per an order of Private-Space," signed an agreement in 2005 affirming that it had "received and read a copy of the [Private Placement] Memorandum" it "relied solely upon that and other fund

documents, as well as any independent investigations by HSSL, when subscribing in the Funds."
Opp'n at 9–10.  Furthermore, the subscription agreements allowed HSSL, as agent for Private-
Space, to choose an account to receive payments for redemptions of shares in Sentry.  *Id.*;
Molton Decl. Ex. 7 at 180–81; Joyce Decl. at 6–9, 11–13.  HSSL chose to use its U.S. based
account, housed at its affiliate HSBC USA in New York.  Opp'n at 10; Joyce Decl. at 6–9, 11–
13.  In this way, HSSL acted in the forum for the benefit of and on behalf of Private-Space.

### c.    Whether Private-Space Both Exercised Control Over and Was Aware of and Consented to HSSL's Activities

To assert an agency relationship, the principal must have exercised "some control" over
the purported agent.  *Scholastic, Inc. v. Stouffer*, 2000 WL 1154252, at *5 (S.D.N.Y. Aug. 14,
2000).  For the purposes of personal jurisdiction analysis, this control prong is satisfied when the
principal has "[an] ability . . . to influence [the agent's] acts or decisions by virtue of the parties'
respective roles."  *Id.*  (citing *Cutco Indus.  v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).
Control means the "actual exercise of control."  *Hau Yin To v. HSBC Holdings, PLC*, 700 F.
App'x 66, 68 (2d Cir. 2017).  However, absolute control by the principal is not necessary.
*Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442 (S.D.N.Y. 2008).  The knowledge and
consent prong is satisfied when the principal is apprised of the agent's activities.  *See Struna v.
Leonardi*, 626 F. Supp. 3d 657, 664 (S.D.N.Y. 2022).  Because certain of the same facts in this
case bear on "knowledge and consent" and "control," the two questions may be considered
simultaneously.  *See Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 326 n.6 (S.D.N.Y. 1998) ("The
same considerations which lead this Court to conclude that the plaintiffs have not satisfied the
'control' prong of *Kreutter,* indicate that plaintiffs also have not satisfied the 'knowledge' and
'consent' prongs of the agency test."); *Branham v. ISI Alarms, Inc.,* No. 12-CV-1012 (ARR)
(MDG), 2013 WL 4710588, at *7 (E.D.N.Y. Aug. 30, 2013).

Knowledge and consent of the principal have been found where an agent forwarded information to the principal (*Sec. Ins. Co. of Hartford v. ITA Textiles Corp.*, 2000 WL 1576879, at *2–4 (S.D.N.Y. Oct. 23, 2000)), where the complaint asserts that the principal received a policy procured by its agent with a "New York forum selection clause that [the principal] knew or should have known was included" (*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 2021 WL 2000371, at *9 (S.D.N.Y. May 19, 2021)), and where the principal is alleged to have done nothing after having received a cease-and-desist letter aside from forwarding the letter to counsel. *Branham*, 2013 WL 4710588, at *7.

The Liquidators argue that Private-Space exercised significant control over, and had knowledge of and consented to HSSL's subscription and redemption-related activities, such that Private-Space was the principal with respect to those transactions and exercised the requisite control over HSSL as its agent. Opp'n at 17, ECF No. 326. Private-Space entered into a custodian agreement with HSSL in December 2004, pursuant to which Private-Space appointed HSSL to act as custodian for its investments. Opp'n at 9; Molton Decl. Ex. 6 at 221, ECF No. 327. Under this agreement, HSSL could execute subscriptions and redemptions only upon receipt of "Proper Instructions" from Private-Space. Molton Decl. Ex. 6 at -227–29 ("SERVICES RELATING TO DERIVATIVE ACTIVITIES"). The custodian agreement also required HSSL to "send a trade confirmation after any trade executed on behalf of [Private-Space]" *Id.* at -226. In accordance with this requirement, HSSL sent confirmations for subscriptions and redemptions to Fedesa, Private-Space's investment manager and agent. *See id.* Ex. 3 at -256; *see also id.* Exs. 5, 7–8. HSSL was obligated to deliver to Private-Space at any "reasonable intervals" as Private-Space required "a full account of all receipts and payments made and other action taken by [HSSL] pursuant to [the custodian agreement]." *Id.* at -236.

Based on the foregoing and the lack of allegations that Private-Space objected to these actions or instructed HSSL to act differently, the Plaintiffs have sufficiently alleged Private-Space's consent to HSSL's actions.

Private-Space claims that "HSSL subscribed (and redeemed) on behalf of PSL only when expressly instructed to do so by PSL." *Id.* Ex. 12 at 7 (Amended Answers and Objections of Private-Space). However, the Defendant attempts to confine the scope of HSSL's duty to that of passive intermediary who undertook no more responsibility than "essentially ministerial" execution of Private-Space's investment directions. *See* Reply at 13, ECF No. 337. In this way, Private-Space attempts to distinguish between the "essentially ministerial actions" executed by HSSL under the control of Private-Space, and the concomitant U.S. activity and due diligence conducted by HSSL in relation to BLMIS investments generally. *Id.* at 13–14. The Defendant contends that the "Plaintiffs have made no showing whatsoever that PSL ever directed HSSL to do anything in New York." *Id.* at 14; *see also id.* at 13 (arguing that HSSL acted as Private-Space's agent only in the "very limited capacity of mechanically implementing subscription/redemption decisions already independently made by PSL, and was not engaged to, and never did, provide investment advice of any sort to PSL").

However, this attempt to limit the scope of HSSL's actions as an agent to passive activity is not dispositive regarding personal jurisdiction analysis. As set forth *supra*, the scope of agency in the context of personal jurisdiction is determined in the Second Circuit by examining whether the agent acted in the forum for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal. *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017). Where an agent's activities open the principal to financial gain, the principal exercises "some control" over the purported agent, and the principal is apprised of the

agent's activities, the agent is considered an agent of that principal for the purposes of personal

jurisdiction analysis. *See In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 336 (finding

defendants benefited from agent's trading activities which could result in gain if financially

successful and exercising personal jurisdiction over defendants); *Scholastic, Inc. v. Stouffer*,

2000 WL 1154252, at *5–7 (finding the defendant "exercise[ed] some control over [the agent's]

activities" and ultimately that plaintiffs "properly alleged personal jurisdiction" over the

principal in part through the agent's representation of the defendant in New York and the agent's

solicitation of business in New York); *Struna v. Leonardi*, 626 F. Supp. 3d 657, 664 (S.D.N.Y.

2022) (holding that the knowledge and consent prong is satisfied when the agent shares all

relevant activities and decisions with the principal).  As a result, the Plaintiffs' evidence and

allegations, including the custodian agreement entered into between Private-Space and HSSL,

the requirement that HSSL subscribe to and redeem shares in the Funds on behalf of Private-

Space only if Private-Space instructed HSSL to execute such transactions, and confirmations

sent by HSSL to Fedesa, are sufficient to establish Private-Space's control over and knowledge

and consent to HSSL's activity.  Having found that it is appropriate to consider the conduct of

HSSL with the relevant actions performed by Private-Space directly, the Court will now examine

the sufficiency of the alleged contacts, considering the contacts alleged to have been performed

by the Defendant directly and through HSSL.

### 2. <u>Defendant's Use of Correspondent Accounts</u>

The Plaintiffs point to Private-Space's choice of correspondent accounts as sufficient to

establish minimum contacts with the United States.  Opp'n at 27–34, ECF No. 326.

"Correspondent accounts are accounts in domestic banks held in the name of foreign financial

institutions" that are used "to effect dollar transactions."  *Licci ex rel. Licci v. Lebanese*

*Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan*

*Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)).

Plaintiffs allege that Private-Space, through HSSL, its purported agent, deliberately selected and

used U.S. correspondent accounts to effectuate the redemption payments that form the harms for

which Plaintiffs seek redress.[18]  Opp'n at 11, 30, ECF No. 326.

Defendant argues that the "mere use of a correspondent account by a foreign bank to

clear transfers for a foreign contract denominated in U.S. dollars does not, as a matter of law,

confer jurisdiction over the foreign bank."  Mem. L. at 17, ECF No. 202 (citing *Hau Yin To v.*

*HSBC Holdings PLC*, No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*,

700 F. App'x 66 (2d Cir. 2017)).

The cases that Defendant relies upon are distinguishable from the circumstances here.

*Hau Yin To* found no basis for personal jurisdiction over a foreign defendant where the "wiring

of funds through New York . . . was passive, rather than 'integral' to the alleged Ponzi scheme"

and where the "passage of money through the U.S. bank accounts w[as] merely incidental and

not specifically directed by any of the [defendants] to facilitate the Ponzi scheme."  *To*, 2017 WL

816136, at *7 n.6.  These facts were contrasted with those presented in *Al Rushaid v. Pictet &*

*Cie*, 28 N.Y.3d 316, N.E.3d 1 (2016), where the New York Court of Appeals "held that the

foreign bank was subject to personal jurisdiction in New York because the 'defendants

---

[18]        The use of correspondent accounts concerns only the transfers that originated from Sentry.  Opp'n at 11,
ECF No. 326 ("Sentry wired $13,237,978.21 of redemption payment—roughly 78%—to HSSL's U.S.
correspondent account at HBUS, as directed by HSSL in its redemption request on behalf of Private-Space.  The
remaining $3,828,519.74 of redemption payment . . . came from Sigma.").  The investments in Sigma were in Euros,
not U.S. dollars, and therefore did not require the use of U.S. correspondent accounts.  Am. Compl. ¶ 42; *see also*
Mem. L. at 4 n.4, ECF No. 202 ("Sigma investments were denominated in Euros, not U.S. dollars . . . . Plaintiffs do
not assert jurisdiction with respect to redemptions from Sigma based on the use of correspondent accounts."); *see
also* Opp'n at 27 n.15 ("While Private-Space and its agent did not use a U.S. correspondent account for its
subscription to and redemption of Sigma shares[,] Private-Space is nonetheless subject to jurisdiction with respect to
that transaction, as the Liquidators' [other] jurisdictional theories . . . do not turn on correspondent account use.").

[including the foreign bank] orchestrated the money laundering and that the New York account was integral to the scheme.'" *Id.* (citing *Rushaid*, 28 N.Y.3d at 328) (alterations in original); *see also Vasquez v. H.K. & Shanghai Banking Corp. Ltd.*, 477 F. Supp. 3d 241, 253 (S.D.N.Y. 2020) (distinguishing between the "'unintended and unapproved use of a correspondent bank account, where the nondomiciliary bank is a passive and unilateral recipient' of money transfers, and the '[r]epeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer[.]'") (alteration in original) (quoting *Rushaid*, 28 N.Y.3d at 326–27).  Furthermore, in *Rushaid*, "there was a scheme in which the foreign bank specifically contemplated wiring tainted funds into a New York account from which corrupt payments were then further distributed to individuals with accounts at the foreign bank." *To*, 2017 WL 816136, at *7 n.6.

Similarly, any reliance on *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010) is misplaced.  *See* Mem. L. at 18, ECF No. 202.  In *Tamam*, the District Court made clear that the complaint failed to provide "allegations that any money from any of these accounts was exchanged for U.S. dollars through a correspondent bank in New York." *Tamam*, 677 F. Supp. at 727.  The District Court noted that the missing proposition, "i.e., the actual transfer of money through New York" was the "only factual predicate on which th[e] Court could potentially base its jurisdiction." *Id.*; *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 58 (2d Cir. 2012) (discussing, in a case "factually similar" to *Tamam*, the failure of plaintiffs to allege that the conduct giving rise to the cause of action was directly financed by funds transferred through New York).

Finally, with regard to *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339–40 (S.D.N.Y. 2016), the Court notes that the import of this case was already discussed by the District Court in *Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026 (S.D.N.Y. June 22,

2020).  The District Court explained in *Graham* that under *Hill*, a court evaluating whether a defendant purposefully availed itself of conducting activities in the forum must "look[] at the totality of the circumstances."  *Id.* at *11.  "While [one] fact alone might not necessarily be sufficient, . . . upon consideration of the 'totality of the circumstances,'" the Court may nevertheless find that the Defendant purposefully availed itself of New York.  *Id.* at *16 (quoting *Hill*, 207 F. Supp. 3d at 338).

Here, the Plaintiffs have shown that the Defendant was able to use either a foreign-based or a U.S.-based correspondent bank account for its redemption requests and, through its alleged agent, chose the latter.  *See* Molton Decl. Ex. 9, ECF No. 327 (Sentry redemption record); *see* Joyce Decl. at 6–9, ECF No. 328.; *id.* at 11 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* at 12 ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 12–13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that Defendant "and its agent frequently used U.S. correspondent accounts in transacting with Sentry."  Opp'n at 30, ECF No.

326.  Defendant did so repeatedly, using U.S.-based correspondent accounts at least five times to make over $11.3 million of subscription payments.  Opp'n at 30.  Defendant, through its agent, selected and used its correspondent account at HSBC Bank USA ("HBUS") in New York to receive a redemption payment from Sentry.  *Id.*; Molton Decl. Ex. 9 at -253 (record of May 2007 redemption payment of $13,237,978.21).  Private-Space accomplished the conduct at the heart of the Liquidators' claims through its use of the correspondent accounts.  The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts.  *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

Defendant next argues that "[t]here is no allegation that HSSL or PSL was involved in the selection of this correspondent account [for subscription payments] by the Funds' agent." Mem. L. at 21, ECF No. 202.  Private-Space argues that the knowing use of correspondent accounts is the "unilateral activity of another party" and thus not an appropriate consideration when determining whether defendant has sufficient contacts with the forum.  *Id.* (quoting *Helicopteros*, 466 U.S. at 417).  As stated above, however, the Liquidators have shown that Defendant actively selected the correspondent account as a means of moving redemption funds through New York.  *See* Joyce Decl. at 8, ECF No. 279 (listing multiple "correspondent banks offer[ing] U.S. dollar correspondent accounts located outside of the U.S." during the relevant period).  Defendant was free to designate an account of its choice, inside the United States or outside, to effectuate transfers and chose one based in the U.S. to receive redemption payments. *See id.* at 9–11 ("Factors Influencing Choice of Correspondent Account"); *id.* at 11 ("[T]he subscription agreements direct subscribers to wire the payments to the Fund's account at HSBC Bank, New York. The subscription agreements further direct the subscribers to identify the

28

remitting bank for those redemption payments. The relevant clauses contain no requirement that the bank utilized for sending subscription payments be based in the U.S.").

The Second Circuit has determined that allegations of a "foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (N.Y. 2012)); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum."). [19] A course of dealing can be established through as little as "14 currency exchange transactions between" two foreign entities made through a New York bank. *Al Rushaid*, 28 N.Y.3d at 325.

The Liquidators have provided support for the allegation that HSSL, acting as agent of the Defendant, chose to use a U.S. correspondent account at HSBC Bank USA in New York to receive a payment from Sentry. Opp'n at 11, ECF No. 326; Molton Decl. Ex. 9 (records of redemption request and payment). The subscription and redemption forms show that Defendant designated the U.S.-based correspondent bank, to which Sentry accordingly sent the relevant payment. While the Defendant in this proceeding is only alleged to have designated a correspondent account for one redemption payment, this redemption was no small amount. Private-Space is alleged to have received over $13 million through this transaction,

---

[19]     Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent." 70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

demonstrating its purposeful availment of the banking system of New York and the United

States. Whether discretionary or execution-only, Defendant chose to use New York-based

accounts while foreign options existed.

### 3. Defendant's Business Contacts with the Forum

The Liquidators assert that Private-Space "intentionally invested in BLMIS feeder funds

Sentry and Sigma knowing that the Funds were designed to subsequently invest that money in

New York-based BLMIS. Private-Space is subject to this Court's jurisdiction with respect to its

Sentry and Sigma redemptions as a result of that conduct." Opp'n at 18–19, ECF No. 326.

Defendant describes the allegations that HSSL knew the subscription payments into the Fairfield

Funds on behalf of beneficial shareholders such as Private-Space would be invested in BLMIS in

New York as the unilateral activity of a third-party administrator of the Funds, which Defendant

argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*,

466 U.S. 408, 417 (1984). *See* Mem. L. at 10, ECF No. 202.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at

regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a

nonresident corporation in a cause of action not related to those purchase transactions."

*Helicopteros*, 466 U.S. at 418. The Supreme Court found that "one trip" to the forum "for the

purpose of negotiating the transportation-services contract . . . cannot be described or regarded as

a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416. The Liquidators, however,

have described more substantial contacts here.

First, the Liquidators point to the documents given to Private-Space by the Funds' U.S.-

based manager, Fairfield Greenwich Group ("FGG"), after Private-Space requested such

documents. Opp'n at 5–7, 20–23, ECF No. 326. These documents "made clear that the main

purpose of the Funds' existence was to invest in BLMIS." *Id.* at 7; *see also* Molton Decl. Ex. 1 at -368–69, ECF No. 327 (2003 Sentry Private Placement Memorandum stating that at least 95% of Sentry's assets would be allocated to the split strike conversion strategy, that BLMIS had, at that time, "approximately 95% of the Fund's assets under custody" and that Bernard L Madoff "serves as sub-custodian for certain assets of the Fund"); *id.* Ex. 24 at -953 (2005 email from FGG containing Sigma Private Placement Memorandum describing the business objective of Sigma as "seek[ing] to achieve capital appreciation of its assets by purchasing shares in Fairfield Sentry Limited . . . which principally utilizes an options trading strategy described as 'split strike conversion.'"). These documents show that Defendant was aware at the time that its investments in Sentry were effectively investments in BLMIS in New York. Private-Space, through its agent, HSSL, executed subscriptions into Sentry with this knowledge. *See id.* Ex. 7 (March 2005 Sentry Subscription Agreement).[20]

In August 2018, this Court held that it does not have personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund." *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018). The Liquidators here rely on the subscription agreements and private placement memoranda not to show consent, but to show that when Defendant invested in Sentry it did so knowing that it would avail itself of the benefits and protections of New York. Opp'n at 21–23. The subscription agreements, signed by HSSL an agent of Private-Space, in this way, support the Plaintiffs' showing of contacts with the forum.

---

[20]    As noted *supra* note 6, Private-Space's initial investment in Sentry was placed through Citco Bank Nederland N.V.

The Plaintiffs have supplied further evidence to support the allegations of contacts. Exhibits show Private-Space was informed of the relationship between the Fairfield Funds and BLMIS in New York through due diligence before and during the relevant subscription period. Opp'n at 22; Molton Decl. Ex. 13 (September 2006 email from FGG employee to an employee of Fedesa on behalf of Private-Space with due diligence materials on Sentry including a brochure, a monthly update, and responses to due diligence questions); *id.* Ex. 15 at -307 (document attached to August 2005 email explaining the importance of the split strike strategy as "implement by Bernard L. Madoff Investment Securities LLC" to Sentry's investment strategy); *id.* Ex 22 (August 2004 email from FGG employee to Fedesa on behalf of Private-Space "attach[ing] the information requested regarding the Fairfield Sentry Fund"); *id.* Ex. 23 (December 2003 email from FGG regarding year-end information for Sentry and "analysis conducted on the Fairfield Sentry fund").

Private-Space has argued that "most emails sent to Private Space or its Monaco-based investment advisory firm, Fedesa, from Fairfield representatives were sent from the U.K. or Switzerland." Hr'g Tr. 57:1–4, ECF No. 357. The Plaintiffs' evidence shows that the relevant emails to Private-Space's agents include ones from FGG employees with addresses bearing the country code designations for the United Kingdom, (Molton Decl. Exs. 13, 22–24) Monaco, (*id.* Ex. 21, 25) and Switzerland (*id.* Ex. 25). However, one email included as an exhibit by the Plaintiffs includes an individual with an explicitly U.S.-based email address. *Id.* Ex. 21 (email from individual with "fggus.com" address). While Private-Space alleged at the Hearing that this employee was "based in Switzerland" in spite of the U.S.-based email address (Hr'g Tr. 57 5–9), it has not presented evidence supporting this claim. Furthermore, the Plaintiffs allege that one email includes a "discussion with New York-based Amit Vijayveriga." Opp'n at 20–21. This

email is from a member of FGG with a Swiss address ("fggch.com") to an employee of Fedesa in

Monaco, discussing a meeting in Milan, Italy.  *Id.* Ex. 25 ("Dear Dr. . . . I wish to reconfirm the

meeting with the fund manager of Fairfield Sentry, Amit Vijayvergiya, on Friday, June 9th,

2006, at 5:00 PM in the Vespucci A room at the Hotel Principe di Savoia, Piazza della

Repubblica 17, Milan.").  At this stage, the Court must "resolve all doubts, including factual

disputes, in the plaintiff's favor."  *Averbach v. Cairo Amman Bank,* 2023 WL 5016884, at *4

(S.D.N.Y. June 30, 2023) (citing *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197

(2d Cir. 1990)).

The evidence provided by the Plaintiffs demonstrates more than mere purchases or a one-

time visit to the forum.  The Liquidators have demonstrated facts supporting continuous and

systemic contacts with the forum.

### 4.  Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction

The Court will address Private-Space's remaining arguments that the alleged contacts are

not jurisdictionally relevant under Supreme Court precedent.  Mem. L. at 12–15, ECF No. 202.

Defendant argues that the Plaintiffs' allegations amount to "mere knowledge that Sentry would

invest money it raised in the BVI with BLMIS in New York," which it states is "insufficient as a

matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014).  *Id.* at 12.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally

relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted

activities within, contacted anyone in, or sent anything or anyone to Nevada."  *Walden*, 571 U.S.

at 289.  The Supreme Court further stated that it is impermissible to allow the "plaintiff's

contacts with the defendant and forum to drive the jurisdictional analysis."  *Id.*  As the Supreme

Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and

"the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at

285.  Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with

the forum State may be intertwined with his transactions or interactions with the plaintiff or other

parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investments into

BLMIS in New York, selection and use of U.S.-based correspondent accounts, and interactions

with the Fairfield Greenwich Group, as described above, demonstrate that Private-Space took

affirmative actions on its own apart from the conduct of the Plaintiffs.  *See* Opp'n at 21–22, ECF

No. 326.  The Liquidators have shown that the Defendant knew and intended that, by investing

in the Funds, Defendant's money would enter into U.S.-based BLMIS.  *Id.*; *see also* Molton

Decl. Ex. 1 (Sentry private placement memorandum).  This certainty can be found in the

Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-

based BLMIS.  *See id.* at -363 ("The Manager, in its sole and exclusive discretion, may allocate a

portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value,

measured at the time of investment) to alternative investment opportunities other than its 'split

strike conversion' investments . . . .").  Moreover, Defendant conducted due diligence

investigations and benefited from the materials that it received from FGG which confirmed the

investments would be made with BLMIS in New York.  *See id.* Exs. 13–15, 22–24 (described

*supra*, section IV.B.3).

Defendant next argues that the Liquidators' evidence of Defendant's contacts with the

United States amounts to little more than the stream of commerce theory rejected by *J. McIntyre

Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882–86 (2011), where the Court stated that "it is not

enough that [a] defendant might have predicted that its goods will reach the forum," but rather

the defendant must "engage[] in conduct purposefully directed at [the forum]."  Mem. L. at 14, ECF No. 202.  The Liquidators argue that the Defendant did not merely expect that the investments would reach the United States, but rather that Defendant's express purpose of investing in the Fairfield Funds was to invest with BLMIS in New York.  Opp'n at 24, ECF No. 326 ("Private-Space invested and directed its agent to invest in Madoff feeder funds with the *express aim* of having those investments placed with a U.S.-based investment fund to take advantage of the U.S. securities markets and while knowing that the Funds was *contractually required* to invest at least 95% of the money they received in U.S.-based BLMIS.") (emphasis in original); *id.* at 24 ("The sole purpose for subscribing for shares of the Funds was to ultimately redeem those shares . . . ."); *id.* at 32 ("Private-Space . . . itself and through its agent, deliberately chose to invest in and profit from the U.S. securities market and repeatedly used the U.S. banking system to do so . . . ."); *id.* at 7 ("In other words, the offering materials made clear that the main purpose of the Funds' existence was to invest in BLMIS.").  This conduct was purposefully directed at the forum.

The Court thus finds that Defendant's selection and use of U.S. correspondent accounts, due diligence, and communications with FGG concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong.  The contacts are not random, isolated, or fortuitous.  The contacts demonstrate Private-Space's purposeful activities aimed at New York in order to effectuate transfers from Sentry.  The Plaintiffs have thus provided facts that sufficiently support a prima facie showing of jurisdiction over the Defendant.

**C.  Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct**

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. ----, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027.  Instead, a  court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the claims "here are not about, and do not arise out of, any investment with BLMIS."  Mem. L. at 4, ECF No. 202.  However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated. Am. Compl. ¶¶ 180–91, No. 167.  The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS.  The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds.  *Id.* ¶ 181. The Defendant's contacts with the United States, in investing in, in communications with, and redemptions from the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum.  *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

**D.** **Whether Assertion of Personal Jurisdiction is Reasonable**

If a defendant has sufficient minimum contacts, the Court must then ask "whether the

assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial

justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank*

*Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Where the plaintiff "makes the threshold

showing of the minimum contacts required for [exercising personal jurisdiction], a defendant

must present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3

(quoting *Bank Brussels Lambert*, 305 F.3d at 129). Factors the Court will consider include the

burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's

interest in obtaining convenient and effective relief, the interstate judicial system's interest in

obtaining the most efficient resolution of controversies, and the shared interest of the states in

furthering fundamental substantive social policies. 305 F.3d at 129.

The Defendant argues that "the United States' interest in adjudicating this dispute is

minimal at best. The dispute is between foreign parties arising under foreign law pursuant to a

foreign contract for the return of cash sent between two foreign countries in a purely foreign

transaction." Mem. L. at 22, ECF No. 202. Defendant further argues that the proceeding is non-

core, ancillary, and only tenable due to Chapter 15 recognition. *Id.* at 23 (citing *In re Fairfield*

*Sentry Ltd.*, 458 B.R. 665, 682 (S.D.N.Y. 2011) (Preska, C.J.)).

Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced. In that

case, the District Court determined whether the proceeding was core or non-core; it did not

determine whether adjudication or jurisdiction in the United States was reasonable. *See id.* at 675. Further, the Court has already found that it has subject matter jurisdiction over these proceedings. *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6, 2018). Chapter 15 allows for recognition of Sentry's foreign main proceeding. 11 U.S.C. § 1501(a) ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . . ."); *id.* § 1504 ("A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515."). Defendant correctly states that cases brought under Chapter 15 are ancillary to foreign proceedings. *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *2. The ancillary character of such cases does not necessarily mean that the United States has minimal interest in the dispute.

Defendant argues that "Plaintiffs have proffered no reason why the United States is more reasonable than their home jurisdiction of the BVI, which is also the jurisdiction in which PSL is incorporated (or even HSSL's home jurisdiction of Luxembourg)." Mem. L. at 5. Private-Space suggests that the Liquidators may be engaged in forum-shopping through "maneuvering [that] demonstrates a lack of interest in obtaining a convenient and effective relief" and states that there is a burden placed on litigating in the forum as the "witnesses and evidence in this action are all overseas." *Id.* at 6, 23–24; *see also id.* at 23 (stating that Private-Space has "no physical presence in the United States and no records, files or witnesses with information about the litigation located here").

The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home

base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023).

Private-Space has participated in this litigation for over six years and is represented by U.S. counsel. *See, e.g.,* Notice of Appearance, ECF No. 45; Suppl. Mem. L. in Opp'n to Pls.' Mot. for Leave to Amend, ECF No. 61. Furthermore, the United States has a strong interest in ensuring the integrity of its financial systems.

Defendant has alleged that other forums may be able to hear the claims. What it has not done is demonstrate how this forum would fail to provide effective relief. *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3. Defendant does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023). The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable. The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . . ." *See Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. 154.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**


Dated: August 07, 2024
       New York, New York

                                   /S/ John P. Mastando III_____
                                   THE HONORABLE JOHN P. MASTANDO III
                                   UNITED STATES BANKRUPTCY JUDGE